STATE OF NORTH CAROLINA v. JAMES EDWARD (JIMMY) BRITT

No. 9

(Filed 17 December 1975)

1. Jury § 7— jurors opposed to capital punishment — excusal for cause

The trial court properly excused for cause prospective jurors who eventually indicated, frequently only after inquiry by the court, that they were irrevocably committed to vote against a verdict carrying the death penalty regardless of the facts and circumstances that might be revealed by the evidence.

2. Constitutional Law § 30— right to fair trial — duty of court and prosecutor

It is the duty of both the court and the prosecuting attorney to see that a defendant's right to a fair trial is sustained.

3. Criminal Law § 102— argument of counsel — discretion of court

The argument of counsel is left largely to the control and discretion of the presiding judge and counsel is allowed wide latitude in the argument of hotly contested cases.

State v. Britt

4. Criminal Law § 102— argument of counsel — evidence and inferences
    Counsel may argue to the jury the facts in evidence and all reasonable inferences to be drawn therefrom and the law relevant thereto.

5. Criminal Law § 102— conduct of counsel — injecting personal beliefs not supported by evidence
    Counsel may not, by argument or cross-examination, place before the jury incompetent and prejudicial matters by injecting his own knowledge, beliefs and personal opinions not supported by the evidence; nor may counsel ask impertinent and insulting questions which he knows will not elicit competent or relevant evidence but are designed simply to badger and humiliate the witness.

6. Criminal Law § 102— characterizations of defendant by prosecutor
    The district attorney should refrain from characterizations of defendant which are calculated to prejudice him in the eyes of the jury when there is no evidence from which such characterization may legitimately be inferred.

7. Criminal Law § 102— questions by district attorney — informing jury of defendant's prior conviction in case being tried
    In this prosecution for first degree murder, questions asked by the district attorney during cross-examination of defendant which informed the jury that defendant had been on death row as a result of a prior conviction of first degree murder in the case being tried were so prejudicial to defendant that their prejudicial effect could not have been cured by the court's instructions to the jury to disregard defendant's prior conviction and return a verdict based solely upon the evidence presented in the present trial.

8. Criminal Law § 102— unsupported argument of district attorney — irrelevant principles of law
    In a prosecution for first degree murder which allegedly occurred in the home of deceased's estranged wife, the repeated argument of the district attorney that deceased had a right to defend himself "in his own home" was unsupported by the evidence and violated the rule that counsel may not argue principles of law not relevant to the case; such improper argument was not cured when the court sustained the defendant's objection and stated that the evidence tended to show that deceased and his wife were separated and that defendant was an invitee of defendant's wife since the district attorney continued to argue the point.

9. Criminal Law § 102— unsupported argument of district attorney — theory based on personal beliefs
    In this prosecution for first degree murder, the argument of the district attorney that defendant, after he shot and killed deceased, cut himself with a knife to cover up the murder was wholly unsupported by the evidence or by any facts or circumstances permitting such an inference and violated the rule that counsel may not travel outside the record and place before the jury an incompetent and prejudicial theory of the case grounded wholly on personal beliefs and opinions not supported by the evidence.

APPEAL by defendant from *Clark, J.,* 16 September 1974 Session, ROBESON Superior Court.

Defendant is charged in a bill of indictment, proper in form, with the first degree murder of Clarence Blackwell on 3 May 1973 in Robeson County.

H. L. Wiggins testified that he had known defendant for six or seven years; that three or four days prior to the death of Clarence Blackwell on 3 May 1973 he sold defendant a .357 magnum for $100.00; that State's Exhibit 1 is the weapon involved in that transaction.

David Blackwell, decedent's eleven-year-old son, testified that on the night of 3 May 1973 he was awakened by a "bang" and went into the hallway that leads from the bedroom to the living room, a distance of ten or twelve feet, and walked to the living room door. "I saw my daddy and Jimmy Britt fighting. They were in a chair and my daddy, Clarence Blackwell, was on top of him. They looked like they were fighting. I do not know how long I watched them in the chair fighting. I saw my daddy get up and he staggered. He then headed for the front door. . . . When my daddy got up, he was facing away from Jimmy Britt and he had his back to him. The door was open and my daddy took three or four steps toward it. . . . Jimmy picked up a gun and shot. He picked up a pistol. He turned it towards the door. I could see my daddy. He was still inside at that time. His back was toward Jimmy Britt. He shot my daddy in the back. I could see the gun go off and saw fire come out of it. Jimmy was holding the gun when it fired. He shot my daddy inside and he must have walked or run outside. I did not see him fall. I saw Jimmy Britt pick up another gun and walk out . . . the door."

On cross-examination David Blackwell stated that his father and mother were not living together, his father having left the home and moved out; that after the fight was over he found his father's knife in the living room in front of the coffee table with the blade open and that he put the knife under the cushions of the chair. This witness further stated that his father was "sort of out the door" when defendant shot him.

Allene Watson testified that she lived next door to Mrs. Carolyn Blackwell on 3 May 1973; that the Blackwells had been separated almost a year at that time; that Jimmy Britt lived in a house right behind the Blackwell and Watson homes. On

the night in question at approximately 10 p.m. she heard a motor running and saw defendant's truck and a patrol car stopped on a dirt road beside the Watson house. Shortly thereafter defendant's truck left and went toward town and a few minutes later she saw the truck in a service station across the road from Mrs. Blackwell's house. While watching, she saw Mrs. Blackwell's car pull out and head toward town and "then saw Mr. Britt take out behind her in his truck." A few minutes later they both returned and entered the Blackwell house. About 10:30 p.m. a car parked in her front yard and she saw Clarence Blackwell go toward Mrs. Blackwell's house and up onto the porch. Three or four minutes later she saw Mr. Blackwell come out of the house, walking pretty fast, his hands up, his face toward the road. When he reached the edge of the porch she heard a shot and heard Clarence Blackwell say, "Oh, my God," and he toppled from the porch into the front yard. Shortly thereafter she saw defendant come out of the house with something in his hands and leave the premises. She observed these things from her window next to the Blackwell house.

Billy Ray Watson, son of Mrs. Allene Watson, was fifteen years old on 3 May 1973. About 10 p.m. that night he observed a state patrolman who had someone stopped on the highway nearby and saw defendant's vehicle with motor running in the driveway leading to defendant's house. Defendant stayed there until the patrolman left and then drove to a nearby filling station across from the Blackwell house. Shortly thereafter Mrs. Blackwell's car left and defendant's truck followed it. Five or ten minutes later he saw the same two vehicles parked in front of Mrs. Blackwell's porch. A short time later he heard a horn blow and went around to the front yard where he saw Clarence Blackwell. He went back inside and three or four minutes later saw Mr. Blackwell rapidly leaving the Blackwell home with his hands over his head. As Mr. Blackwell got to the steps the witness heard a shot and heard Mr. Blackwell say, "Oh, my God." Blackwell pitched forward off the porch. Two or three minutes later defendant left the Blackwell home carrying a long object which he placed in his truck and then drove away.

Deputy Sheriff Carl Herring testified that on 3 May 1973 at about 10 p.m. defendant came to his home and offered him $50.00 to jail Clarence Blackwell. He told defendant he had no warrant for Clarence Blackwell and had no right to arrest him without a warrant unless he violated the law in an officer's presence. Defendant said Clarence Blackwell had been harassing

Blackwell's estranged wife Carolyn by running along behind her and bumping her bumper as she went to work at the mill. Deputy Herring advised defendant that he would follow Mrs. Blackwell to work that night and if Blackwell violated the law in his presence he would then have a right to arrest him. Defendant said if the officer "couldn't take care of it he could."

Officer Herring stated that he knew Clarence Blackwell was the estranged husband of Carolyn Blackwell and that it was reported that defendant was going with her at that time.

Later that night, in response to a radio message, Deputy Herring and Deputy Sanderson drove to the residence occupied by Carolyn Blackwell and her children, arriving about 11:30 p.m. There they found the body of Clarence Blackwell lying at the bottom of the front steps. The officers observed a small wound in Blackwell's back just under the belt line and, turning the body over, observed two wounds in the front. The body was later taken to the morgue at Southeastern General Hospital.

Dr. Marvin Thompson, a medical expert specializing in pathology, testified that on 3 May 1973 he viewed the body of Clarence Blackwell in the morgue at Southeastern General Hospital. Mr. Blackwell was dead. He performed an autopsy, found an entry wound in the lower part of the back to the right of the midline and two irregular exit wounds in the lower abdomen to the right of the midline approximately one inch apart. He theorized that the bullet had split to produce two exit wounds. The bullet pierced the lateral part of the sacrum. In the opinion of Dr. Thompson, Clarence Blackwell died from hemorrhage secondary to the gunshot wound.

Defendant's motion for judgment of nonsuit at the close of the State's evidence was denied.

Defendant, testifying in his own behalf, stated that on 3 May 1973 between 9:30 and 10:00 p.m., Clarence Blackwell telephoned and said he was going to kill defendant and Carolyn. As a result of that call defendant went to the police station and talked to Officer Baxley who said he could not do anything. He talked to an auxiliary policeman named John McLendon. After talking with Carolyn Blackwell on the phone defendant started to her house and saw Deputy Sheriff Herring along the way. He told Officer Herring about the threats and asked him to go to Carolyn Blackwell's house. Officer Herring told him he couldn't go. Defendant then returned to the police station to

see if other officers who might be willing to help had reported for duty. He then left the police station and went straight to the Blackwell home, entered, and locked the door. He sat on the couch in the living room and placed a pistol on the coffee table and a shotgun on the couch. Carolyn Blackwell sat across the room on a sofa chair facing the door. The only light in the room came from a small television. Defendant heard a car going up and down the road blowing the horn and telephoned the police department again but received no help. Within a few minutes Clarence Blackwell burst into the room. In the ensuing melee, Blackwell cut defendant in the stomach, on his back, leg, hand and side. Defendant managed to reach the pistol and shot Blackwell. Defendant then picked up his shotgun and went out the door. He went directly to the police station and from there to the hospital where he remained for six days. He was examined by Dr. Lawrence who found a laceration one and one-half inches long in the left abdominal wall, a two-inch laceration on the right knee, a two and one-half inch cut in the lateral thigh and a laceration in the right lateral chest wall two and one-half inches long. A tube was placed in the right pleural cavity for drainage.

Defendant admitted on cross-examination that he was in love with Carolyn Blackwell and had been dating her since March 1973. He stated that he went to her house on the night of 3 May 1973 armed with a pistol and a shotgun because Clarence Blackwell had threatened to kill him and Carolyn.

Robert Ransom testified that on 2 May 1973 Clarence Blackwell, referring to Jimmy Britt, said he was going to kill the "son of a bitch." The witness said he knew Clarence Blackwell was "mad about Jimmy running with his wife."

Herman Smith testified that on 3 May 1973 at about 9:30 p.m. Clarence Blackwell came to his door and wanted to use the telephone. He admitted Blackwell who made a phone call, and he heard Blackwell say, "Jimmy, you son of a bitch, you been going with my wife and I'm going to kill you." Blackwell then sought to borrow a shotgun but his request was declined. Clarence Blackwell was drinking and brought a small can of beer into the house with him.

This witness admitted on cross-examination that he had been convicted of public drunkenness two or three times, driving under the influence twice, careless and reckless driving and other traffic offenses.

State v. Britt

Vicki Hall, a fifteen-year-old high school student, testified that on 3 May 1973 she lived beside the Blackwell home on Highway 20. At approximately 10:30 p.m. she was at home in bed, saw lights from a car, and then saw a person walking toward the Blackwell home. She heard someone kick the door and then heard a shot. After the shot she saw Jimmy Britt get into his truck and drive away. At the same time she observed Carolyn Blackwell and her children leaving in their car. The next morning she went over to the Blackwell home, examined the door, and saw two footprints on it.

Shirley Jackson testified that on the morning of 4 May 1973 she went to the Blackwell home to get some clothing for the two Blackwell children. She observed that the front door had been "busted" and there were two footprints on the door. The lock was just hanging on the inside of the door. The furniture in the living room had been pushed around and there was a large amount of blood on the floor, the couch and a chair.

Johnny McLendon testified that on 3 May 1973 he saw Jimmy Britt in the parking lot in front of the St. Pauls Police Department; that Britt told him Clarence Blackwell had threatened to kill him. He told defendant that a threat was no violation of the law and there was nothing that could be done about it.

Defendant rested his case, and the State, in rebuttal, called Officer Carl Herring who testified that he got the weapon, marked State's Exhibit 1, from the residence of Jimmy Britt; that there was one empty cartridge in it and all the other cartridges were loaded. The weapon, a .357 magnum pistol, was offered in evidence.

Detective Luther Sanderson, Robeson County Sheriff's force, testified that he investigated the killing of Clarence Blackwell together with Officer Carl Herring. In that investigation he examined the front door but did not see two footprints on it. He examined the living room but found no blood on the couch and no blood on the chair but did see a few drops of blood on the floor—this was the only blood he found in the room. The lock on the door was hanging loose and the face of the door was split.

Both the State and defendant rested. Defendant's motion for nonsuit at the close of all the evidence was denied. The trial judge submitted first degree murder, second degree murder,

voluntary manslaughter and not guilty as permissible verdicts. The jury returned a verdict of guilty of murder in the first degree, and defendant was sentenced to death. He appealed to this Court assigning errors discussed in the opinion.

*Moses & Diehl by Philip A. Diehl, attorney for defendant appellant.*

*Rufus L. Edmisten, Attorney General; James E. Magner, Jr., Assistant Attorney General, and Archie W. Anders, Associate Attorney, for the State of North Carolina.*

HUSKINS, Justice.

[1] Defendant contends the trial court erred in excusing for cause certain prospective jurors who indicated they could not return a verdict of guilty knowing such verdict would necessitate imposition of a death sentence.

We note initially that in his brief defendant names no specific juror he contends was improperly challenged for cause. He apparently challenges the phraseology of the questions propounded by the district attorney to prospective jurors McCall and McDonald. The district attorney asked these and other jurors whether they were "opposed to it" (capital punishment) or "felt it was necessary." The initial responses of these jurors were rather equivocal. Nevertheless, despite the imprecise questions of the district attorney, we conclude that all jurors who were excused for cause, including jurors McCall and McDonald, eventually indicated, frequently only after further inquiry by the court, that they were irrevocably committed to vote against a verdict carrying the death penalty regardless of the facts and circumstances that might be revealed by the evidence.

With respect to jury selection in capital cases, we have interpreted *Witherspoon v. Illinois,* 391 U.S. 510, 20 L.Ed. 2d 776, 88 S.Ct. 1770 (1968), to mean that veniremen may not be challenged for cause simply because they voice general objections to the death penalty or express conscientious or religious scruples against its infliction; but veniremen who are unwilling to consider all of the penalties provided by law and who are irrevocably committed, before the trial has begun, to vote against the death penalty regardless of the facts and circumstances that might emerge in the course of the trial may be challenged for cause on that ground. *State v. Monk,* 286 N.C. 509, 212 S.E. 2d 125 (1975) ; *State v. Honeycutt,* 285 N.C. 174,

State v. Britt

203 S.E. 2d 844 (1974); *State v. Crowder*, 285 N.C. 42, 203 S.E. 2d 38 (1974). In light of these principles, we hold that the prospective jurors here in question were properly excused for cause. Defendant's first assignment of error is overruled.

Even so, we again emphasize that counsel involved in the trial of capital cases, particularly prosecuting attorneys, when interrogating veniremen concerning their scruples and attitudes toward capital punishment, should employ questions which incorporate the terminology required by *Witherspoon* and *Monk* and insist on unequivocal answers. "Since *Witherspoon* has so clearly specified the ultimate question that must be answered, the voir dire examination of prospective jurors should be based on questions phrased in *Witherspoon* language. Unless this course is followed, new trials will often be necessary in cases otherwise free from prejudicial error." *State v. Monk, supra.*

This brings us to the question whether defendant was denied a fair trial by prejudicial conduct of the district attorney. A few of the alleged improprieties assigned as error are discussed below.

1. The prosecutor inquired whether or not defendant considered Carolyn Blackwell, the wife of the deceased, to be his girl friend. The following exchange then occurred before the jury:

"Q. [By the district attorney:] Isn't she your girl friend?

A. [By defendant:] Yes, sir.

Q. She was your girl friend on the 3rd of May and prior thereto; isn't that right?

A. Yes, sir.

Q. She's discussed this case with you in detail while you sat on death row for the past year; hadn't she?

EXCEPTION NO. 85.

A. No, sir.

Q. Huh?

A. No, sir.

Q. She's been up there frequently and talked with you on death row about this case, after you were convicted the last time?

EXCEPTION NO. 86.

MR. DIEHL: OBJECTION.

THE COURT: SUSTAINED."

At this point the court directed the jury to retire to the jury room, and in its absence defense counsel moved for a mistrial on the ground that the foregoing questions were so prejudicial that a fair trial by this jury was no longer possible. The trial judge stated: "I'm very much concerned about this. This jury should not know that he has been previously convicted and sentenced to death. I will see counsel in Chambers." The judge retired to chambers to discuss the matter with the district attorney and defense counsel. Upon returning to the courtroom the trial judge, with the consent of defense counsel, recalled the jury and instructed it that defendant previously had been convicted of first degree murder and sentenced to death but his conviction had been reversed by the Supreme Court of North Carolina so that the present trial was entirely new. The judge instructed the jury not to consider the prior trial and not to be influenced to any extent by defendant's prior conviction. Following such instruction defense counsel stated that he desired no further instructions and that his motion for mistrial was withdrawn. Subsequently, upon completion of the trial and during its charge to the jury, the court again instructed the jury to disregard defendant's prior trial and conviction, not to hold it against him, and to render their verdict solely upon new evidence offered at this particular trial.

2. In his argument to the jury the district attorney asserted that Clarence Blackwell, the deceased, had a right to defend himself in his own home. This evoked the following exchange:

"MR. DIEHL [defense counsel]: OBJECTION, your Honor. He keeps referring to the man's right in his own home. Evidence is that he was separated from his wife for a long period of time. He goes over it and over it.

MR. BRITT [district attorney]: It is his home.

THE COURT: Well, as to that, the Court is not going to give any instructions to that effect. The evidence tends

to show that they were separated and that the defendant was an invitee of the woman who lived there. SUSTAINED.

MR. BRITT: Tell you what, I left my wife to go to Washington a couple of weeks ago and I was gone for nearly a week. I was separated from her.

MR. DIEHL: OBJECTION.

MR. BRITT: When I came back I didn't expect to find nobody else to be in there and I expect I done something about if I found anybody there."

3. During closing argument the district attorney said: "I just don't believe in my own heart and mind that Jimmy Britt was cut as bad as he says he was. I don't believe he was cut the way he was. A man who kills another can do anything, I believe, if he wants to. Just take a knife and whack across the stomach and once across the bottom and once across the leg and once across the arm, and report into the hospital. What better way to cover it up, Ladies and Gentlemen of the Jury?" There is no evidence, inferential or otherwise, to support this argument.

4. During his closing argument the district attorney referred to the fact that Mrs. Blackwell was not called to testify for defendant. In doing so he stated that the reason for her failure to testify was *"because she hasn't got what it takes to perjure herself the way Jimmy Britt swore to you."* Defendant's objection to this statement was sustained, whereupon the district attorney *immediately* asked again, "Where is Carolyn?" At this point the trial judge instructed the jury not to consider the remarks about perjury.

5. During the redirect examination of David Blackwell, a State's witness and the son of the deceased, the district attorney repeatedly asked leading questions, to which defendant's objections were sustained. The trial judge stated that he considered the questions to be leading notwithstanding the tender age of the witness. Despite the court's admonition not to lead the witness, the prosecutor continued to do so. After the court sustained defendant's objection to still another question as leading, the district attorney stated: "It was meant to be."

6. During further redirect examination of the witness Blackwell, and during his closing argument, the district attorney implied and stated that the possible inconsistencies in the wit-

ness's testimony could be attributed to the fact that he had been "brainwashed" while visiting defendant during his stay in prison and during meetings arranged by Mrs. Blackwell with defendant's half-sister. There is no evidence in the record to support this statement. At one point during the recross examination of this witness, counsel for defendant asked whether anyone had told him to do anything but tell the truth. The objection of the district attorney was overruled and the witness answered in the negative. The district attorney retorted: "Somebody told him something."

7. During final argument the district attorney repeatedly referred to the knife used by the deceased as "a little, old pocketknife" or a "penknife." The knife was not offered in evidence and its size is not shown by the record. Defendant's objections to such references to the knife were sustained.

[2] Every person charged with a crime has an absolute right to a fair trial. By this it is meant that he is entitled to a trial before an impartial judge and an unprejudiced jury in keeping with substantive and procedural due process requirements of the Fourteenth Amendment. *Rogers v. Richmond,* 365 U.S. 534, 5 L.Ed. 2d 760, 81 S.Ct. 735 (1961) ; *Lisenba v. California,* 314 U.S. 219, 86 L.Ed. 166, 62 S.Ct. 280 (1941) ; *State v. Chamberlain,* 263 N.C. 406, 139 S.E. 2d 620 (1965) ; *State v. Carter,* 233 N.C. 581, 65 S.E. 2d 9 (1951). It is the duty of both the court and the prosecuting attorney to see that this right is sustained. *State v. Monk, supra; State v. Thompson,* 278 N.C. 277, 179 S.E. 2d 315 (1971) ; *State v. Barefoot,* 241 N.C. 650, 86 S.E. 2d 424 (1955) ; *State v. Phillips,* 240 N.C. 516, 82 S.E. 2d 762 (1954) ; *State v. Correll,* 229 N.C. 640, 50 S.E. 2d 717 (1948), *cert. denied* 336 U.S. 969, 93 L.Ed. 1120, 69 S.Ct. 941 (1949) ; *State v. Howley,* 220 N.C. 113, 16 S.E. 2d 705 (1941). To these ends there are rules of practice and decorum with which all counsel involved in the trial of criminal cases must abide.

The district attorney owes honesty and fervor to the State and fairness to the defendant in the performance of his duties as a prosecutor. His duties are more fully stated in 63 Am. Jur. 2d, Prosecuting Attorneys, § 27 (1972), as follows:

"The public interests demand that a prosecution be conducted with energy and skill, but the prosecuting officer should see that no unfair advantage is taken of the accused. It is as much his duty to see that a person on trial is not

deprived of any of his statutory or constitutional rights as it is to prosecute him for the crime with which he may be charged. Nonetheless, zeal in the prosecution of criminal cases is to be commended and not condemned. If convinced of the defendant's guilt, the prosecuting attorney should, in an honorable way, use every power that he has to secure the defendant's conviction. At the same time, it is his duty to hold himself under proper restraint and avoid violent partisanship, partiality, and misconduct which may tend to deprive the defendant of the fair trial to which he is entitled, and it is as much his duty to refrain from improper methods calculated to bring about a wrongful conviction as it is to use every legitimate means to bring about a just one."

*See Berger v. United States,* 295 U.S. 78, 79 L.Ed. 1314, 55 S.Ct. 629 (1935). *Accord, State v. Stegmann,* 286 N.C. 638, 213 S.E. 2d 262 (1975) ; *State v. Monk, supra; State v. Westbrook,* 279 N.C. 18, 181 S.E. 2d 572 (1971), *vacated on other grounds,* 408 U.S. 939, 33 L.Ed. 2d 761, 92 S.Ct. 2873 (1972) ; 23A C.J.S., Criminal Law §§ 1081, 1083 (1961).

[3, 4] The argument of counsel is left largely to the control and discretion of the presiding judge and counsel is allowed wide latitude in the argument of hotly contested cases. *State v. Stegmann, supra; State v. Monk, supra; State v. Thompson, supra; State v. Seipel,* 252 N.C. 335, 113 S.E. 2d 432 (1960) ; *State v. Barefoot, supra; State v. Little,* 228 N.C. 417, 45 S.E. 2d 542 (1947). Counsel may argue to the jury the facts in evidence and all reasonable inferences to be drawn therefrom and the law relevant thereto. *State v. Noell,* 284 N.C. 670, 202 S.E. 2d 750 (1974) ; *State v. Conner,* 244 N.C. 109, 92 S.E. 2d 668 (1956) ; *State v. Willard,* 241 N.C. 259, 84 S.E. 2d 899 (1954). Language may be used *consistent with the facts in evidence* to present each side of the case. *State v. Monk, supra.*

[5, 6] Even so, counsel may not, by argument or cross-examination, place before the jury incompetent and prejudicial matters by injecting his own knowledge, beliefs, and personal opinions not supported by the evidence. *State v. Monk, supra; State v. Noell, supra; State v. Phillips, supra; State v. Dockery,* 238 N.C. 222, 77 S.E. 2d 664 (1953). Nor may counsel ask impertinent and insulting questions which he knows will not elicit competent or relevant evidence but are designed simply to badger and humiliate the witness. *State v. Daye,* 281 N.C.

592, 189 S.E. 2d 481 (1972) ; *State v. Wyatt,* 254 N.C. 220, 118 S.E. 2d 420 (1961). The district attorney should refrain from characterizations of defendant which are calculated to prejudice him in the eyes of the jury when there is no evidence from which such characterization may legitimately be inferred. *See State v. Christopher,* 258 N.C. 249, 128 S.E. 2d 667 (1962) ; *State v. Wyatt, supra; State v. Bowen,* 230 N.C. 710, 55 S.E. 2d 466 (1949). "Prosecuting attorneys are in a very peculiar sense servants of the law. [Citation omitted.] They owe the duty to the State which they represent, the accused whom they prosecute, and the cause of justice which they serve to observe the rules of practice created by law to give those tried for crime the safeguards of a fair trial." *State v. Phillips, supra.*

While G.S. 84-14 confers upon counsel the right to argue to the jury the whole case as well of law as of fact, "argument is not without its limitations. The trial court has a duty, upon objection, to censor remarks not warranted by either the evidence or the law, or remarks calculated to mislead or prejudice the jury. [Citations omitted.] If the impropriety is gross it is proper for the court even in the absence of objection to correct the abuse *ex mero motu, State v. Smith,* 240 N.C. 631, 83 S.E. 2d 656 (1954)." *State v. Monk, supra. Accord, State v. Miller,* 271 N.C. 646, 157 S.E. 2d 335 (1967).

Application of these principles to the present case compels the conclusion that the district attorney's courtroom tactics transcend the bounds of propriety and fairness. More specifically, we hold that the improprieties enumerated in paragraphs numbered 1, 2 and 3 constitute prejudicial error requiring a new trial.

[7]  With respect to the challenged cross-examination of defendant shown in paragraph numbered 1, the district attorney has a right and duty in a homicide prosecution to cross-examine a defendant who testifies in his own defense, *State v. Ross,* 275 N.C. 550, 169 S.E. 2d 875 (1969), *cert. denied* 397 U.S. 1050, 25 L.Ed. 2d 665, 90 S.Ct. 1387 (1970) ; *State v. Wentz,* 176 N.C. 745, 97 S.E. 420 (1918), but such cross-examination must be fair at all times. Cross-examination by which the prosecutor places before the jury inadmissible and prejudicial matter is highly improper and, if knowingly done, unethical. *State v. Daye, supra; State v. Phillips, supra;* American Bar Association, Project on Standards for Criminal Justice, Standards Relating to the Prosecution Function and the Defense Function, §§ 56, 57

at 38-39 (1971) ; American Bar Association, Code of Professional Responsibility, Canon 7 (1974).

The trial judge attempted to correct this transgression by sustaining defendant's objection and twice instructing the jury to disregard defendant's prior conviction and return a verdict based solely upon the evidence presented in the present trial. Ordinarily, counsel's improper conduct may be cured by such action by the trial court, *see State v. Sparrow,* 276 N.C. 499, 173 S.E. 2d 897 (1970) ; *State v. Correll,* 229 N.C. 640, 50 S.E. 2d 717 (1948), since the presumption is that jurors will understand and comply with the instructions of the court. *State v. Self,* 280 N.C. 665, 187 S.E. 2d 93 (1972) ; *State v. Long,* 280 N.C. 633, 187 S.E. 2d 47 (1972). We have recognized, however, that some transgressions are so gross and their effect so highly prejudicial that no curative instruction will suffice to remove the adverse impression from the minds of the jurors. *See State v. White,* 286 N.C. 395, 211 S.E. 2d 445 (1975) ; *State v. Hines,* 286 N.C. 377, 211 S.E. 2d 201 (1975) ; *State v. Roach,* 248 N.C. 63, 102 S.E. 2d 413 (1958) ; *State v. Smith,* 240 N.C. 631, 83 S.E. 2d 656 (1954) ; *State v. Dockery, supra; State v. Eagle,* 233 N.C. 218, 63 S.E. 2d 170 (1951) ; *State v. Hawley,* 229 N.C. 167, 48 S.E. 2d 35 (1948) ; *State v. Little, supra.* A fair consideration of the principles established and applied in these cases constrains us to hold that no instruction by the court could have removed from the minds of the jurors the prejudicial effect that flowed from knowledge of the fact that defendant had been on death row as a result of his prior conviction of first degree murder in this very case. The probability that the jury's burden was unfairly eased by that knowledge is so great that we cannot assume an absence of prejudice. *State v. Hines, supra.* We hold the challenged questions by the district attorney were highly improper and incurably prejudicial.

[8] In paragraph numbered 2 the repeated argument of the district attorney that the deceased had a right to defend himself "in his own home" was unsupported by the evidence and placed before the jury legal principles not applicable to the case. Although the court sustained defendant's objection, stating that the evidence tended to show that the deceased and his wife were separated and that defendant was an invitee of Mrs. Blackwell, the district attorney quite effectively overruled the court and continued to argue the point. This violates the rule that counsel may not argue principles of law not relevant to the case. *State*

*v. Crisp,* 244 N.C. 407, 94 S.E. 2d 402 (1956). The courteous rulings of the able and patient trial judge had no deterring effect upon the prosecutor. His conduct in this manner was disrespectful to the court and prejudicial to defendant.

[9] In paragraph numbered 3 the argument of the district attorney that defendant, after he shot and killed Clarence Blackwell, cut himself with a knife to cover up the murder is wholly unsupported by the evidence or by any facts or circumstances permitting such an inference. This violates the rule that counsel may not travel outside the record and place before the jury an incompetent and prejudicial theory of the case grounded wholly on personal beliefs and opinions not supported by the evidence. *State v. Monk, supra; State v. Noell, supra.* This improper argument was not brought to the attention of the court by timely objection so as to afford the court an opportunity to correct the transgression in the charge. Even so, the fact that it occurred without correction only adds to the biased atmosphere created by overzealousness of the prosecution.

The matters disclosed by numbered paragraphs 4, 5, 6 and 7 further accentuate the cumulative effect of the district attorney's excessive infringement upon defendant's constitutional right to a fair trial at the hands of an unprejudiced jury.

The balance between the dual roles of the district attorney as impartial representative of the people and zealous advocate for the State is a delicate one. Yet according fair treatment to the defendant does not require a compromise of advocacy, for zealousness and fairness are complementary qualities in an effective prosecution where the goal to be achieved is what it should be—a just conviction of the guilty. *See* H. B. Vess, "Walking a Tightrope: A Survey of Limitations on the Prosecutor's Closing Argument," 64 Journal of Criminal Law and Criminology 23 (March 1973). The district attorney who prosecuted this case most likely committed the excesses noted by an overzealous desire to secure the conviction of an accused he believed to be guilty of murder. In that connection the following admonition of Justice Ervin, speaking for this Court in *State v. Warren,* 235 N.C. 117, 68 S.E. 2d 779 (1952), is most appropriate:

> "Ministers of the law ought not to permit zeal in its enforcement to cause them to transgress its precepts. They should remember that where law ends, tyranny begins."

We deem it unnecessary to discuss other assignments since the errors alleged may not recur on retrial.

For the reasons stated the judgment below is vacated and the case remanded to the Superior Court of Robeson County for a

New trial.