IN THE SUPREME COURT OF NORTH CAROLINA

No. 309PA22

Filed 23 May 2024

STATE OF NORTH CAROLINA

v.

WALTER D. GIESE

On writ of certiorari pursuant to N.C.G.S. § 7A-32(b) to review an order denying the State's petition for writ of certiorari entered on 30 June 2022 by Judge Thomas Wilson in Superior Court, Onslow County. Heard in the Supreme Court on 31 October 2023.

*Joshua H. Stein, Attorney General, by Zachary K. Dunn, Special Deputy Attorney General, for the State-appellant.*

*Mary McCullers Reece and R. Christian Smith for defendant-appellee.*

EARLS, Justice.

In early 2022, Walter D. Giese was charged with cyberstalking and making harassing phone calls to Sharon Griffin. At the time, Ms. Griffin was the county manager for Onslow County. Appointed by and responsible to the Board of Commissioners, Ms. Griffin oversaw the county's facilities and public services. Each year she also proposed a county budget to the Board.

As county manager, Ms. Griffin sometimes crossed paths with District Attorney Ernie Lee (DA Lee). The elected chief of the Fifth Prosecutorial District, DA

Lee spearheads criminal prosecutions in Onslow County. He and his assistant district attorneys (ADAs) try cases in the county's courthouse and work in county-provided offices. Onslow County also covers some operating expenses for the district attorney's office (DA's office), such as custodial services and furniture. Because county managers superintend county courthouses and propose the annual budget, Ms. Griffin's duties at times overlapped with DA Lee's.

Before trial, Mr. Giese moved to disqualify DA Lee and his staff from prosecuting him. As county manager, Ms. Griffin's decisions could affect the finances and functioning of DA Lee's office. And as the alleged victim, Mr. Giese contended, prosecutors in the Fifth Prosecutorial District had "self-interest" in appeasing Ms. Griffin. That "self-interest" could seep into their decision-making, shaping whether, for what, and how they prosecuted Mr. Giese. Extending that logic, Mr. Giese urged the district court to disqualify DA Lee and his staff because Ms. Griffin's position as county manager triggered a conflict of interest. The district court agreed and barred the Fifth Prosecutorial District from handling the case.

The State challenged that disqualification order by petitioning the superior court for a writ of certiorari. But after a hearing, that court denied the State's petition, found a conflict of interest, and left the disqualification order intact. This Court allowed the State's petition for writ of certiorari to review the superior court's order. We now vacate and remand.

## I.  Facts and Procedural History

## A. The Parties

Mr. Giese is no stranger to local government. As a licensed soil scientist and registered environmental health specialist, he works in wastewater services. In that sphere, he helps businesses obtain septic tank permits and serves as an on-site wastewater evaluator for the state. Mr. Giese's job brings him in close contact with county and municipal governments. As part of his work, he regularly interacts with Onslow County staff. This case centers on his contacts with a particular employee: Ms. Griffin. According to the State, Mr. Giese made harassing phone calls to and cyberstalked Ms. Griffin. But according to Mr. Giese, he merely criticized Ms. Griffin when requesting county records.

Everyone agrees, however, that Ms. Griffin was county manager at all relevant times. The Board of Commissioners appointed her to that position in 2020. In that role, she worked under the Board's guidance as the "chief administrator of county government." *See* N.C.G.S. § 153A-82(a) (2023). Among her duties, she supervised the county's programs and services and managed its facilities. *See* N.C.G.S. § 153A-82(a)(2). She also played a role in finances. Each year, she proposed a county budget to the Board. *See* N.C.G.S. § 153A-82(a)(5). After the Board adopted a budget, she ensured that the money was properly spent. *See* N.C.G.S. § 153A-82(a)(4).

DA Lee is the State's chief prosecutor for the Fifth Prosecutorial District. As the elected district attorney (DA), he has "exclusive responsibility" for prosecuting crimes in his district. *See State v. Diaz-Tomas*, 382 N.C. 640, 646 (2022) (cleaned up).

Four counties are under his jurisdiction, including Onslow County.[1] *See* N.C.G.S. § 7A-60(a1) (2023). Twenty ADAs work under him and share in his duties. *See id.* Because Mr. Giese was charged and slated for trial in Onslow County, DA Lee oversaw his case.

Though county managers and DAs hold different roles with different tasks, their duties sometimes intersect. For one, counties must provide "physical facilities for the judicial system operating within their boundaries." *In re Alamance Cnty. Ct. Facilities,* 329 N.C. 84, 99 (1991); *see also* N.C.G.S. § 7A-302 (2023). That mandate includes office space for DAs. *See id.*; *see also* N.C.G.S. § 7A-304(a)(2) (2023). Counties also cover some expenses for the DA's office, such as custodial services and office furniture. *See id.* As part of their duties, then, county managers supervise the facilities where DAs and their staff work. And when county managers propose the annual budget, their request covers the DA office's expenses.

## B. The District Court Disqualifies the DA's Office

Mr. Giese worried that Ms. Griffin's dual role as victim and county manager could influence his case. He thus moved to disqualify DA Lee's office from prosecuting him. The State opposed the motion. But after a hearing, the district court granted it, concluding that Ms. Griffin's "inherent authority" as county manager kindled a conflict of interest with the DA's office.

---

[1] Along with Onslow County, DA Lee's district also includes Duplin, Jones, and Sampson Counties. *See* N.C.G.S. § 7A-60(a1) (2023).

According to the district court, Ms. Griffin's role required her to "rely on the [DA]'s office for the County she supervises to prosecute [Mr. Giese]." The court reasoned that Ms. Griffin was an important government employee whose responsibilities overlap with the DA's interests. The court noted, for instance, that Ms. Griffin "supervises and has control over the county building, services, and furniture provided to the [DA]'s Office." She also made "budget requests that directly impact" DA Lee and his staff. From that, the district court "assume[d]" that Ms. Griffin "has discussions with the [DA]'s office (sic) concerning their (sic) needs for facility (sic) and services before the budget proposal is submitted." And since Ms. Griffin wielded "discretion to make significant decisions that impact the [DA]'s office," the district court found an actual conflict of interest that "could rise to a level of self interest in obtaining [Mr. Giese's] conviction." The court thus disqualified the entire District Attorney's Office for the Fifth Prosecutorial District and assigned Mr. Giese's case "to a conflicts Prosecutor (sic)."

## C. The Superior Court Denies the State's Petition for Certiorari

Dissatisfied with that ruling, the State petitioned the superior court for a writ of certiorari. Mr. Giese opposed the State's petition. After a hearing, the superior court, like the district court, found an actual conflict of interest. Relying on *State v. Britt*, 291 N.C. 528 (1977), the superior court maintained that an actual conflict exists if a prosecutor "has any self interest in obtaining the conviction of defendant." That self-interest existed in Mr. Giese's case, the court reasoned, since Ms. Griffin

"prepares and submits the annual budget" for Onslow County, including the budget "for the [DA's office] for expenses not including salaries." Because the alleged victim was "directly involved with preparing the budget for" DA Lee's office, the superior court found that an actual conflict of interest barred the entire Fifth Prosecutorial District from prosecuting Mr. Giese. It thus denied the State's petition and sustained the district court's disqualification order.

**D. The State Requests Review of the Superior Court's Order**

The State sought a writ of certiorari from the Court of Appeals to review the superior court's order. The Court of Appeals denied its petition. Judge Tyson dissented, arguing that the district court made "a gross error of law." The State then petitioned this Court for a writ of certiorari to review the superior court's order. We allowed the petition.

## II.    Standard of Review

In this case, we review the superior court's grounds for denying the State's petition for writ of certiorari. We thus examine whether, as a matter of law, Ms. Griffin's position as county manager created an actual conflict requiring DA Lee's disqualification. Because that inquiry raises a legal question, we review it de novo. *See State v. Khan*, 366 N.C. 448, 453 (2013).

## III.    Legal Standard for Disqualifying District Attorneys

**A.  The Interests at Play**

The decision to disqualify a DA is a multifaceted one. This Court has thus rejected a "per se disqualification rule," electing instead to "balance the respective interests of the defendant, the government, and the public." *State v. Camacho*, 329 N.C. 589, 600 (1991) (cleaned up). That course, we have explained, is "constitutionally preferable" and avoids needless disruption of our constitutional system. *Id.* at 599.

On the one hand, DAs are "elected officials whose duty to prosecute is expressly mandated by constitutional provisions."[2] *Id.* They are "chosen for [their districts] by the qualified voters thereof." N.C. Const. art. IV, § 18. And they carry out their "constitutionally and statutorily mandated duties on behalf of the public." *Camacho*, 329 N.C. at 598. Chief among DAs' duties is the "exclusive responsibility" for prosecuting crimes in their district. *Diaz-Tomas*, 382 N.C. at 646 (cleaned up); *see also* N.C.G.S. § 7A-61 (2023).

Because DAs act "on behalf of the State" and its people, N.C. Const. art. IV, § 18, they wield "great power and grave responsibility," *State v. Barefoot*, 241 N.C. 650, 655 (1955). In criminal cases, DAs serve as "advocate[s] of the State's interest." *Britt*, 291 N.C. at 542; *see State v. Smith*, 352 N.C. 531, 559 (2000). But a DA's "first

---

[2] For economy and clarity, this opinion refers to DAs alone. But the same principles apply to ADAs. By Constitution and statute, DAs wield the exclusive "responsibility and authority to prosecute all criminal actions in the superior courts." *State v. Camacho*, 329 N.C. 589, 593 (1991). But an elected DA "may, in his or her discretion and where otherwise permitted by law, delegate the prosecutorial function to others." *Id.* As "lawful designees" of a DA's power and responsibility, ADAs enjoy the authority of the DA's office and the "constitutional and statutory duties" attached to it. *Id.* at 596. For that reason, the same balancing test governs the disqualification of DAs and ADAs alike.

responsibility is not to win at any cost" but "to be a just advocate." *Id.* Because the State has an "elevated responsibility to seek justice above all other ends," a DA—as its mouthpiece—does too. *State v. Hooper*, 358 N.C. 122, 127 (2004). Thus, the State and DAs alike "win[ ] [their] point whenever justice is done." *State v. Williams*, 362 N.C. 628, 638 n.5 (2008) (cleaned up).

When a court disqualifies a DA, it may stymie his role as a fair-minded "representative of the people and zealous advocate for the State." *State v. Britt*, 288 N.C. 699, 714 (1975). From the sidelines, a DA can neither press the State's case nor preserve the cause of justice. An improper disqualification may thus invade the "constitutional and statutory duties" which only a DA and his "lawful designees may perform." *Camacho*, 329 N.C. at 596. And for the same reason, it may "unnecessarily interfere" with "the system established by our Constitution." *Id.* at 600.

Disqualification may also affect the public's interest in a fair and functional justice system. *See id.* When the people elect a DA, they select—and expect—an officer who prosecutes "with energy and skill," while affording just treatment to the accused. *Britt*, 288 N.C. at 710 (cleaned up). Put another way, the public has an interest in seeing defendants "fairly and promptly tried for their alleged crimes." *United States v. Goot*, 894 F.2d 231, 237 (7th Cir.), *cert. denied*, 498 U.S. 811 (1990); *see also Hooper*, 358 N.C. at 127 (underscoring need for the "effective administration of justice"). So when a court ousts a DA from a case, it may impede his elected role. In that way, faulty disqualification may erode a DA's "public protection function" and

cheapen the votes that placed him in office. *See Camacho,* 329 N.C. at 600 (quoting *Goot,* 894 F.2d at 236).

All the same, defendants enjoy a constitutionally protected right to due process and fair proceedings. *Id.* We have indeed recognized that life and liberty—the values at stake in a criminal prosecution—are among the "weightiest interests that our state and federal constitutions serve to protect." *State v. Robinson,* 375 N.C. 173, 189–90 (2020); *accord McBride v. McBride,* 334 N.C. 124, 130 (1993) (noting that "the interest in personal liberty" is, "perhaps, the most fundamental interest protected by the Constitution of the United States"). Thus defendants' interests—like those of DAs and the public—are weighty too and must factor into the calculus. *See Camacho,* 329 N.C. at 600 ("In deciding questions of disqualification we balance the respective interests of the defendant, the government, and the public." (quoting *Goot,* 894 F.2d at 236)).

## B. *Camacho*'s Balancing Test

Our decision in *Camacho* remains the key precedent on disqualification. In that case, an ADA worked as a public defender before joining the DA's office. *Id.* at 591. During her tenure as a public defender, some of her colleagues represented the defendant at his first trial. *Id.* The ADA did not see the defendant's files or touch the merits of his case, though she did research some legal issues for a motion. *Id.* When she started as an ADA, the defendant moved to disqualify her and her colleagues from prosecuting him in his second trial. *Id.* The trial court granted the motion, reasoning

that flatly disqualifying the DA's office was necessary to "avoid even the possibility or impression of any conflict of interest." *Id.* at 593 (emphasis omitted).

We vacated that decision, holding that a mere risk of impropriety could not oust a DA's office from prosecuting a case. *Id.* at 600–01. To respect our constitutional structure and DAs' role in it, we forbade courts from disqualifying prosecutors unless they find an "actual conflict of interest[ ]." *Id.* at 601. "In this context," we explained, an actual conflict exists if a prosecutor once represented the defendant and—by virtue of that attorney–client relationship—gained "confidential information which may be used to the defendant's detriment at trial." *Id.*

Applying that standard, we deemed disqualification improper because the trial court found—and the "uncontroverted evidence" showed—that "the [DA's office] had no actual conflict of interest[ ]." *Id.* at 596. According to the trial court, the ADA never had "any contact, directly or indirectly, with the merits of the [defendant's] case." *Id.* at 597. She culled "no confidential information about the defendant's case while in the Public Defender's Office." *Id.* And she did not convey "any information of a confidential nature" to the DA's office after she switched jobs. *Id.* The trial court thus concluded what "[a]ll of the evidence" confirmed: That no "actual conflict of interests existed on the part of any member of the District Attorney's Office." *Id.* at 602. And since the court found no actual conflict, it "exceeded its authority" by disqualifying the DA's office. *Id.*

*Camacho* offers three key lessons. First, "the mere appearance of impropriety" cannot justify disqualification. *Id.* at 599. An actual conflict requires more than "a *possibility* that an *impression* of a conflict of interest[ ] might arise at some *future* time." *Id.* at 597.[3]

Second, disqualification is off the table "unless and until" the trial court finds "an actual conflict of interest[ ] as that term has been defined in this opinion." *Id.* at 601–02. An actual conflict thus exists when a member of a DA's office once represented a defendant and obtained confidential information that "may be used to the defendant's detriment at trial." *Id.* at 601; *see also id.* at 599. Without that essential ingredient, however, a court's disqualification power lies dormant. *Id.*; *see also State v. Anthony*, 354 N.C. 372, 391–94 (2001) (finding no actual conflict when prosecutors were "initially assigned to be co-counsel for defendant," but joined "the Gaston County District Attorney's Office by the time of trial" because the prosecutors "resigned prior to obtaining any confidential information about the case," did not

---

[3] In his motion to disqualify, Mr. Giese argued that DA Lee had an "apparent conflict of interest" because he and his "staff rel[ied] on the alleged victim for resources and services provided by the County including janitorial and maintenance staff in addition to facilities and furniture." To that, Mr. Giese added another reason to disqualify: The "mere appearance of impropriety based on the professional relationship between the prosecutor and alleged victim erodes the public trust whether or not an actual conflict of interest exist[s]." *Camacho* clearly forecloses that latter rationale. *State v. Camacho*, 329 N.C. 589, 599 (1991); *see also id.* at 597 ("[W]e conclude that the trial court erred by ordering that the [DA] and his staff withdraw from this case because their prosecution of the defendant might create an appearance of a conflict of interest[ ]."). Had the lower courts disqualified the Fifth Prosecutorial District based on "a mere appearance of impropriety," those decisions would be flatly incongruent with our precedent. *See id.* at 599. Because the courts below purported to find an actual conflict between DA Lee and Ms. Griffin, we reach and consider that legal conclusion.

discuss "the case with other prosecutors at their new employment," and "avoid[ed] all contact with the case after changing jobs"); *accord State v. Reid*, 334 N.C. 551, 561 (1993) ("We caution the trial court on remand for a new trial to insure that there is no conflict of interest, as defined in *Camacho*, on the part of the prosecution and no participation in the case against defendant on the part of [his former attorney].").

Third, even if a court finds an actual conflict, it must balance the competing interests to decide the propriety and extent of disqualification. *Id.* Put another way, the cure should not be worse than the disease—the judiciary must "make every possible effort to avoid unnecessarily interfering" with a DA's "performance of constitutional and statutory duties." *Id.* at 595–96. So in crafting relief, a trial court may not "exceed any steps necessary to protect the interests of the defendant or the courts." *Id.* at 596. A disqualification remedy must thus "be drawn as narrowly as possible," reaching only those prosecutors with an actual conflict. *Id.* at 595. When a court embraces an "unnecessarily all-encompassing order," it upsets *Camacho*'s balancing test and distends "the system established by our Constitution." *Id.* at 596.

## IV. Application to Mr. Giese's Case

Here, the lower courts found an actual conflict of interest based on the professional overlap between county managers and DAs. That was error. As defined by *Camacho*, an actual conflict exists when a prosecutor once represented a defendant, "obtained confidential information which may be used to the defendant's detriment at trial," and then "participated in the prosecution of the case or divulged

any confidential information to other prosecutors." *Id.* at 601 (cleaned up). Measured in that light, the professional nexus between Ms. Griffin and DA Lee falls far short of an actual conflict. No evidence suggests—nor does Mr. Giese allege—that anyone in the Fifth Prosecutorial District ever represented him and either "acquired confidential information" or "betrayed any confidences." *Id.* at 597 (cleaned up). Because a county manager's sway in peripheral administrative and budgetary matters did not raise an actual conflict under *Camacho*, disqualification was off-limits.

In holding the opposite, the superior court seized on *State v. Britt*, 291 N.C. 528 (1977), reading that case to "outline[ ] when a conflict of interest exists for a prosecutor." That reliance was misplaced. In *Britt*—a due process case—the same DA tried a defendant multiple times for the same offense, sometimes overzealously. *Britt*, 291 N.C. at 541. Our decision, however, did not hinge on a conflict of interest. Instead, we resolved the defendant's due process claims by examining the "fairness" of the proceedings and the presence of misfeasance. *Id.* at 542. "[A]t all times," we explained, the DA was "acting as the advocate of the State's interest" and properly "seeking to convict and punish the guilty or seeking acquittal of the innocent." *Id.* Nothing suggested otherwise. The record betrayed no "misconduct in this trial." *Id.* No evidence signaled "that the prosecutor has any conflict of interest, e.g., prior representation of defendant." *Id.* And nothing augured "that the prosecutor has any self-interest in obtaining the conviction of defendant, e.g., revenge." *Id.* On that basis,

we discerned no "denial of fairness in permitting [the DA] to prosecute defendant such as would constitute a denial of due process." *Id.*

*Camacho*—decided over a decade after *Britt*—specifically addressed conflicts of interest. The opinion did not cite *Britt* or import its due process analysis into the realm of disqualification. Most importantly, *Camacho* carefully balanced the interests at play when a court is asked to disqualify a DA. From that, it coined a rule aligned with fundamental constitutional values and faithful to our constitutional system. *See Camacho*, 329 N.C. at 601. So when Mr. Giese moved to disqualify DA Lee, *Camacho* supplied the standard; the superior court erred in ignoring it.

A second flaw flowed from the first. Recall that the lower courts did not stop at disqualifying DA Lee—they extended that bar to all members of the Fifth Prosecutorial District. Those disqualification orders were "unnecessarily all-encompassing" and incongruent with *Camacho*'s narrow-tailoring requirement. *See id.* at 596. In *Camacho* itself, we admonished courts from automatically diffusing one prosecutor's conflict to each of her colleagues. *See id.* at 601. Instead, disqualification orders must be narrowly drawn to reach only those prosecutors with an actual conflict. *See id.* at 596. And here, Mr. Giese offered no evidence of an actual conflict with DA Lee, much less the twenty ADAs serving under him. By mandating office-wide disqualification without finding an office-wide conflict, the lower courts "swe[pt] much too broadly." *See id.*

That said, *Camacho* does not preclude defendants from raising due process claims. We need not survey every potential breach of due process, but it goes without saying that "punish[ing] a person because he has done what the law plainly allows him to do is a due process violation of the most basic sort." *United States v. Goodwin*, 457 U.S. 368, 372 (1982) (cleaned up). In the same vein, *Britt* expressly contemplates that misconduct or significant self-interest may raise due process concerns. *Britt*, 291 N.C. at 541–42. And of course, prosecutors may not base decisions on an "unjustifiable standard such as race, religion, or other arbitrary classification . . . [or] a defendant's decision to exercise his statutory or constitutional rights." *State v. Garner*, 340 N.C. 573, 588 (1995); *see also Goodwin*, 457 U.S. at 372 (warning of due process violations when a defendant is "punished for exercising a protected statutory or constitutional right"). But this case does not present—and Mr. Giese does not raise—a colorable due process violation.

## V.   Conclusion

*Camacho* strikes a necessary balance between fairness, functionality, and faithfulness to constitutional design. Applying that decision, we vacate the superior court's order because it—like the district court—disqualified DA Lee and his staff without finding an actual conflict. As *Camacho* makes clear, a county manager's "inherent authority" does not bar a DA from prosecuting a case in which that county manager is the alleged victim. Instead, an actual conflict of interest exists when the prosecution—by virtue of a prior attorney-client relationship—obtains confidential

information that "has been or is likely to be used to the detriment of the defendant." *Id.* at 598; *see also id.* at 601. Nothing of the sort happened in Mr. Giese's case.

Without an actual conflict of interest or legitimate due process concerns, courts may not "unnecessarily interfere with [DAs'] performance" of their "constitutionally mandated duty." *Camacho*, 329 N.C. at 599. Neither condition is present here. We thus vacate the superior court's order denying the petition for writ of certiorari and remand the case for further proceedings consistent with this opinion.

VACATED AND REMANDED.