STATE OF NORTH CAROLINA v. HAROLD HUNTLEY

No. 48

(Filed 14 November 1973)

1. Criminal Law §§ 75, 89— in-custody statement — no waiver of rights — admissibility for impeachment

An accused's prior inconsistent statements, which were not coerced or involuntary in fact but were made without counsel and without waiver of rights, although inadmissible to establish the prosecution's case in chief could properly be used to impeach the accused's testimony; therefore, in a prosecution for kidnapping, assault with intent to commit rape, and crime against nature, the trial court did not err in admitting for impeachment purposes only a statement made by defendant while in custody as to what occurred between him and his alleged victim.

2. Criminal Law § 113— reasonable doubt — assignment of error to charge — no prejudice shown

Defendant's assignment of error to the trial court's instruction on reasonable doubt did not disclose prejudicial error where defendant contended that the court's definition of the term was not explicit enough and suggested that a more elaborate instruction should have been given.

3. Criminal Law § 113— jury instruction on evidence — no error

Trial court's failure to instruct the jury that defendant's alleged confession was not made under oath and was not to be considered as evidence in the trial was not error since the question was not whether the jury should accept the prior unsworn statement of defendant or the sworn testimony of defendant at trial, but the question was to what extent, if any, defendant's testimony at trial was discredited by his prior unsworn statement.

**4. Criminal Law § 114— jury charge — no expression of opinion**

The trial court did not commit error by commenting on the evidence where it correctly reviewed the evidence of the State and defendant in its charge to the jury and instructed that the jury must determine what weight should be given to defendant's testimony at trial.

**5. Criminal Law § 163— assignment of error to failure to charge**

An assignment of error based on failure of the court to give instructions should set out the defendant's contention as to what the court should have charged. Defendant did not suggest what instruction should have been given with reference to voluntary intoxication and failed to show prejudicial error.

APPEAL by defendant from *McConnell, J.*, 19 February 1973 Session of UNION Superior Court.

In separate indictments defendant was charged with the felonies of (1) kidnapping, (2) assault with intent to commit rape, and (3) crime against nature, committed upon Dorothy F. Swaney on 7 October 1972. The three cases grew out of the same transaction and were tried together.

The State's evidence, summarized except when quoted, is set forth below.

On and prior to 7 October 1972, Mrs. Dorothy F. Swaney was living with her sixteen and nineteen-year-old daughters in a house on East Franklin Street in Monroe. She had been separated from her husband for ten years, was forty-two years old, and was attending Central Piedmont College. Although not regularly employed, she had agreed to paint the inside of a house on Redwine Street so people could move in on Saturday, October 7. To meet this deadline, she started about two o'clock in the afternoon of Friday, October 6, and planned to continue until she finished the job. About midnight, she interrupted her work to go home for coffee and a sandwich. She made the trip in her 1964 four-door Cadillac.

Upon arrival at her home, Mrs. Swaney parked the car in the driveway, went into the house, and stayed "about 45 minutes or an hour." Then she went out to her car to go "back to Redwine Street and finish painting." The lights were shining around a Car Center Building which was next to her home. However, she saw no one in the area when she approached and got into her car.

Mrs. Swaney first saw defendant as she prepared to start her car. He appeared at the open window on the driver's side and asked her to take him to Maurice Street. She had never seen him before. When she told him she was "too busy and didn't have time," he replied that "he had a gun and [she] would take him to Maurice Street." Defendant walked around the car and got in the right front seat. Defendant had his hand in his pocket, but she did not see a gun or other weapon before moving her car.

Frightened, Mrs. Swaney started the car. Defendant took a knife from his pocket and opened it. "The knife looked about 10 inches long." When Mrs. Swaney told defendant she didn't know Maurice Street, he said he would tell her which way to go and directed her to drive "outside the city."

On one occasion, when "[a]nother car got behind [them] on the highway," Mrs. Swaney stopped her car and got out "to flag down the car." Defendant got out behind her, forced her back into the car, made her turn off the main road, go down a side road, and stop the car "about 5 or 6 miles from [her] residence."

With the knife in his right hand, he made her get in the back seat, and said "there was something he had to do." Putting the knife "at [her] side and neck," he made her take one leg out of her slacks and pushed her leg over the back seat. He tried to penetrate her vagina with his penis but was unsuccessful. She resisted by moving around and kicking him. Frustrated in that attempt, he stunned her with a blow and then succeeded in "[placing] his private parts in [her] rectum," which she was unable to prevent.

"When it was over," he told her if she "said anything about it he would kill [her]." Saying that he was going to Charlotte, he took her car keys from her. He made her get into the right front seat of the car. Over her protest, he took over the driving and headed toward Charlotte. Observing the edge of the closed knife, she managed to slip it from his pocket and put it in the back seat. She called on him to slow down, saying "that he was making [her] nervous." When they were "going about 35 or 40," she took the keys out of the ignition and jumped out of the car. Although suffering from bruises and lacerations, she ran to the nearby residence of Nathan Hargett, where she was admitted.

In response to a call received about 3:50 a.m. on 7 October 1972 Reid Helms, of the Union County Sheriff's Department, accompanied by Lt. Rollins, proceeded to the Hargett residence on Old 74 about 4 miles west of Monroe.

Before reaching the Hargett residence, the officers observed a "blue and white Cadillac four door" in the road "with the head-lights still on" and the right front door open. At the Hargett residence the officers found Mrs. Swaney, whom they observed "was bruised about the knees, the legs and the arms."

After talking with Mrs. Swaney at the Hargett residence, the officers, accompanied by Mrs. Swaney, went back to the un-occupied Cadillac. It was "maybe 100 or 200 yards" up the road from where she jumped out and fell. After she jumped, the car "kept on moving" but was "not running." They searched the Cadillac and found a closed knife "about the center of the back seat." This knife (State's Exhibit 1) was identified by Mrs. Swaney as the knife with which she was threatened by her kidnapper and assailant.

The officers had traveled "approximately a mile" when they saw defendant. He had one foot on the pavement and the other on the shoulder and "was thumbing." The officers stopped their car and got out. Helms recognized defendant and said, "Harold, we need to talk to you." Mrs. Swaney identified de-fendant in these words: "That's him, he's the one that did it." When told that "he was under arrest for possible assault to commit rape," defendant tried to run away and scuffled with the officers until handcuffs were put on him. Helms testified that he "smelled a faint odor of alcohol on his person at that time."

Later, when defendant was booked in the sheriff's office, Helms removed an earring from defendant's wallet. This ear-ring (State's Exhibit 2) was identified by Mrs. Swaney as an earring defendant was wearing when he kidnapped and as-saulted her. She had described the earring to Helms prior to the arrest of defendant.

During the morning of October 7 a latent palm print was lifted from the inside of a glass in the left rear door of Mrs. Swaney's Cadillac. This print (State's Exhibit 3) and a palm print known to have been made by defendant (State's Exhibit 4) were submitted to and compared by a qualified fingerprint

expert. The expert testified that in his opinion the prints on these two exhibits were prints of the same palm.

The evidence offered by defendant consisted of his own testimony which, summarized except when quoted, was as follows:

He got off from work about 3:30 in the afternoon of October 6. Accompanied by a friend, he went to his mother's home and there drank Scotch and Smirnoff Vodka and smoked marijuana. They left about 6:30 p.m. and went to the Amleeax Club in "New Town." There they sat around, drank beer and some liquor, and danced. He drank Vodka at "New Town" and "was feeling drunk." About midnight, he and others left in a car "owned by a dude from Marshville." He (nobody else) got out at the corner of East Franklin Street, about 4 or 5 blocks from where he lived.

He was on the sidewalk on East Franklin Street when he saw Mrs. Swaney come out of her house. He had seen her before. "She spoke and [he] spoke." She asked him where he was going. When he told her that he lived on Maurice Street, she told him that she "would take [him] home after she went to town and got a newspaper." Mrs. Swaney got in on the driver's side and he "got in on the passenger side . . . in the back seat." They sat in the car and talked 15 or 20 minutes before leaving the house. In the course of their conversation, she told him that she had left her husband and was divorced.

When going down the road, he asked Mrs. Swaney "to turn to the left to carry [him] to Maurice Street." Instead, "[s]he went up West Franklin Street, turned down Church Street and cut down Green Street and she went somewhere else." It was hot in the car and he went to sleep.

When he woke up he was on the Old Charlotte Highway. Mrs. Swaney was not with him. He crawled out of the car "on the driver's side" and "started walking." He was walking "down 74" when Helms and Rollins drove up. He started toward their car. Helms jumped out of the car, put his (defendant's) head against the car and started choking him. He had no knife, did not at any time try to assault Mrs. Swaney and did not take her car.

Upon cross-examination, defendant testified he remembered talking with Helms but had not talked with him during the

---

---

night he was arrested. When asked if he had not told Helms that he had got out of a car operated by his cousin, defendant's objection was sustained. The court then excused the jury and conducted a *voir dire* examination. After hearing the testimony of Helms and of defendant, the court made findings to the effect that defendant signed a waiver-of-rights form and the statement set forth below freely and voluntarily; "that no promises were made to him, no threats, nor was he threatened in any manner"; that, at the time he signed these papers, defendant "was intelligent and normal"; and that "defendant knew he had a right to an attorney, and expressly waived the right to have an attorney present."

No statement made by defendant to the officers was offered in evidence as a part of the State's case.

After defendant rested, the State offered *rebuttal evidence* consisting of two writings, each signed by defendant and witnessed by Helms and Rollins on 7 October 1972 at 7:05 p.m., namely, (1) the waiver-of-rights form (State's Exhibit B), and (2) defendant's account of what had occurred between him and Mrs. Swaney (State's Exhibit C). These were offered and admitted in evidence over defendant's objection "only for the purpose of impeaching the defendant as he heretofore testified, if it does impeach him, and for no other purpose."

On rebuttal, Helms testified that defendant stated he could read and write; that he appeared normal and was cooperative; that defendant's account of what had taken place was in response to Helms's request that defendant tell "exactly what happened"; and that, although in Helms's handwriting, defendant's account of what happened was in defendant's own words.

Defendant's written statement of 7 October 1972 (State's Exhibit C) as to what occurred between him and Mrs. Swaney is as follows:

"I Harold Huntley, being of sound mind, make the following statement freely, without any promise threat or reward.

"I Harold got out of a car, at a point with a cousin John Robert Blakney, when I saw a boy come out of the house on Franklin Street, and go to a Cadillac automobile.

"I Harold asked the person to carry me to Maurice Street. I thought the person was a boy, and from Mrs. Swaney's home,

we went to Parker, where she told me to drive. She then stated for me, Harold, to go somewhere to get a cold drink. I drove the car up Highway 74 about four miles out, when she said I have to go pee. She then took the car keys out of the car, jumped out of the car on New Highway 74, and started thumbing for a ride, when Deputy Sheriff Reid Helms picked me up and brought me to town. Signed Harold Huntley, witnessed Reid Helms and C. L. Rollins."

[The record shows that at the close of all the evidence "the court dismissed the charge of theft of the automobile."]

In each case, the jury returned a verdict of guilty of the crime charged in the indictment. The court pronounced judgments as follows: In #73CR0993, kidnapping, a sentence of imprisonment for life; in #73CR0992, crime against nature, a sentence of imprisonment for ten years; and in #72CR6934, assault with intent to commit rape, a sentence of imprisonment for fifteen years. The judgments in #73CR0992 and #72CR6934 provide that the sentences imposed therein are to run concurrently with the life sentence imposed in #73CR0993.

*Joe P. McCollum, Jr. for defendant appellant.*

*Attorney General Robert Morgan and Associate Attorney George W. Boylan for the State.*

BOBBITT, Chief Justice.

[1]  In Assignment of Error No. 1 defendant asserts that the court committed error "by allowing the State to cross examine the defendant concerning the alleged confession." There is no basis for or merit in this contention. Defendant's objection was *sustained* when the cross-examiner asked defendant if he had not told Helms that he (defendant) had gotten out of a car driven by his cousin.

After sustaining defendant's objection, the court conducted the *voir dire* examination referred to in our preliminary statement. Based upon evidence offered in the absence of the jury and upon his factual findings, the trial judge stated that "the Court will allow the statement to be admitted into evidence, at such time as it may be offered." Exception No. 1, on which Assignment of Error No. 1 purports to be based, is to the court's denial of a motion by defendant "to strike all the proceedings in the Voir Dire Hearing."

In Assignment of Error No. 2 defendant asserts that the court committed error "by allowing the confession of the defendant to be admitted into evidence." He contends that the court's order at the conclusion of the *voir dire* hearing did not contain an explicit finding that the defendant was given each of the warnings in respect of his constitutional rights required by *Miranda v. Arizona,* 384 U.S. 436, 16 L.Ed. 2d 694, 86 S.Ct. 1602, 10 A.L.R. 3d 974 (1966), and therefore it [the so-called confession] was not admissible even for impeachment purposes. There is no merit in this contention.

We need not consider whether the evidence on *voir dire* and the court's factual findings were sufficient to render defendant's written account of his association with Mrs. Swaney admissible as substantive evidence. Suffice to say, it was offered and admitted only as it might tend to impeach the testimony of defendant. We note that the written statement (State's Exhibit C) referred to in the assignment of error as a confession, although it identifies defendant as being the man involved with Mrs. Swaney during the early morning hours of October 7, recounts what occurred between them in a manner tending to exculpate defendant.

In *State v. Catrett,* 276 N.C. 86, 97, 171 S.E. 2d 398, 405 (1970), this Court, based on our interpretation of the exclusionary rule adopted in *Miranda,* held "that in-custody statements attributed to a defendant, when offered by the State and objected to by the defendant, are inadmissible *for any purpose* unless, after a *voir dire* hearing in the absence of the jury, the court, based upon sufficient evidence, makes factual findings that such statements were voluntarily and understandingly made by the defendant after he had been fully advised as to his constitutional rights." In the later case of *Harris v. New York,* 401 U.S. 222, 28 L.Ed. 2d 1, 91 S.Ct. 643 (1971), the Supreme Court of the United States did not so interpret the *Miranda* exclusionary rule. In *Harris,* the Court held that an accused's prior inconsistent statements, which were not coerced or involuntary in fact but were made without counsel and without waiver of rights, although inadmissible to establish the prosecution's case in chief could properly be used to impeach the accused's testimony. The rule enunciated in *Harris* was adopted by this Court in *State v. Bryant,* 280 N.C. 551, 555, 187 S.E. 2d 111, 113 (1972), *cert. den.* 409 U.S. 995, 34 L.Ed. 2d 259, 93 S.Ct. 328 (1972). *Hence, Bryant* superseded *Catrett* as the law in this jurisdiction.

Assignments of Error Nos. 3, 4, 5 and 6 relate to the court's charge. None discloses prejudicial error.

[2] In Assignment of Error No. 3, defendant asserts that the court committed error "by not correctly defining the term 'Reasonable Doubt.' " The assignment does not point out any error in the portion of the charge to which it refers. Defendant contends the court's definition "was not explicit enough" and suggests that a more elaborate instruction should have been given.

[3] In Assignment of Error No. 4, defendant asserts that the court committed error "by failure to correctly instruct the jury concerning the admission of the confession for impeachment purposes." He does not point out any error in the portion of the charge to which he refers, to wit: "Now, the Court allowed the State to introduce the statement, which was made earlier to the police, solely for the purpose of impeaching his testimony, if you find that it does. That goes to the credibility of the witness. That is a matter for you to determine." On appeal, defendant suggests that a more elaborate instruction should have been given. [As indicated above, a similar instruction was given the jury when State's Exhibit C was offered and admitted into evidence.] Defendant contends that the court "did not instruct the jury properly in that they were not told that the earlier statement was not made under oath and they were not to consider it as evidence in this trial." There is no merit in this contention. The question was not whether the jury should accept the prior unsworn statement made shortly after defendant's arrest or the sworn testimony of defendant at trial. It was for the jury to determine to what extent, if any, defendant's testimony at trial was discredited by his prior unsworn statement.

[4] In Assignment of Error No. 5 defendant asserts that the court committed error "by commenting on the evidence of the defendant." The exception on which this assignment is based refers to a portion of the charge in which the court correctly reviewed portions of State's Exhibit C as well as defendant's testimony at trial. Full instructions were given to the effect that it was for the jury to determine what weight should be given to defendant's testimony at trial.

[5] In Assignment of Error No. 6, defendant asserts that the court committed error "by failing to instruct the jury on voluntary intoxication." In view of his complete denial of having molested Mrs. Swaney in any way, it is understandable that this

assignment contains no suggestion as to what instruction defendant contends should have been given with reference to voluntary intoxication. Suffice to say, "[a]n assignment based on failure to charge should set out the defendant's contention as to what the court should have charged." *State v. Wilson,* 263 N.C. 533, 534, 139 S.E. 2d 736, 737 (1965).

Defendant having failed to show prejudicial error, the verdict and judgment are not disturbed.

No error.