STATE OF NORTH CAROLINA v. WAYNE FODDRELL

No. 129

(Filed 31 January 1977)

1. **Criminal Law § 15— motion for change of venue — uncorroborated assertions by defense counsel**

    The trial court did not err in the denial of defendant's motion for change of venue in this rape case where defense counsel offered in support of the motion only his uncorroborated "submission" that twelve unbiased jurors could not be found in the county; that there had "been widespread animosity about this"; that at the time of the preliminary hearing "the feeling was high"; that the matter got widespread publicity in the newspaper circulated in the locale; and that an escape by defendant was given wide circulation.

2. **Constitutional Law § 29; Jury § 7— challenge to venire — exclusion of blacks — assertions by defense counsel**

    The trial court properly denied defendant's challenge to the jury venire based on defense counsel's assertion that "the court could find" that a greater preponderance of jurors were white and "that" would deprive defendant of a trial by a cross section of his peers in the county where defense counsel offered no statistical evidence tending to show systematic exclusion of blacks from jury service, and defense counsel admitted that the jury panel in this case had been drawn as required by law.

3. **Jury § 6— examination of prospective juror — belief in capital punishment**

    In a rape prosecution conducted before the decision invalidating the death penalty, it was not error for the district attorney to ask a prospective juror whether he "believed in capital punishment."

4. **Constitutional Law  §29; Jury § 7— exclusion of jurors for capital punishment views**

    In a rape prosecution conducted before the decision invalidating the death penalty, the trial court properly excused for cause six prospective jurors who made it clear that under no circumstances would they return a verdict of guilty of a crime for which the punishment was death.

5. **Criminal Law § 162— failure to object to evidence — effect of alleged constitutional violation**

    An assertion that evidence was obtained in violation of defendant's constitutional rights does not prevent the operation of the rule that, nothing else appearing, the admission of incompetent evidence is not ground for a new trial where there was no objection at the time the evidence was offered.

State v. Foddrell

6. **Criminal Law § 48— admission by silence — competency for impeachment**

In this prosecution for rape, cross-examination of defendant concerning his failure to deny that he was the victim's assailant when she identified him as the rapist at the scene of the crime immediately after the crime occurred and before he had been given the *Miranda* warnings was competent for the purpose of impeaching defendant's testimony at the trial.

7. **Criminal Law § 48— admission by silence — incompetency if objected to — harmless error**

In this prosecution for rape, defendant's admission on cross-examination that he made no statement at the time the warrant for rape was served on him at the sheriff's office, defendant having been given the *Miranda* warnings and having refused to sign a waiver of his rights prior to service of the warrant, would have been incompetent had defendant made timely objection to the question that elicited it; however, even had defendant objected, evidence of his silence was harmless beyond a reasonable doubt where the victim recognized defendant and there was no reasonable possibility of a mistaken identification of defendant by the victim, officers captured defendant running away from the scene of the crime only moments after its commission, and officers later found defendant's shirt and other items where he said he had left them near the crime scene.

8. **Criminal Law § 76— admission of defendant's statements to officer — absence of voir dire**

The trial court in a rape case did not err in failing to conduct a *voir dire* before admitting for impeachment purposes defendant's statements to an officer that he had left his shirt and two other items at a tree at the crime scene since (1) all the evidence showed that defendant broached the subject of the shirt by requesting officers to retrieve it for him, defendant made no contention that his statements were involuntary or the result of police interrogation, and a *voir dire* could have produced no further evidence, and (2) defendant's statements did not amount to a confession.

9. **Rape § 6— failure to submit lesser offenses**

The trial court in a rape case did not err in failing to submit to the jury the issues of defendant's guilt of assault with intent to commit rape and assault on a female where the victim testified positively that after defendant had choked her and threatened to kill her, he penetrated her forcibly and against her will, and defendant denied that he was the man who assaulted the victim.

APPEAL by defendant under G.S. 7A-27(a) from *Lupton, J.,* at the 3 June 1974 Criminal Session, Superior Court of CASWELL, docketed and argued as Case No. 23 at the Fall Term 1975.

On 20 July 1973, defendant was arrested upon a warrant which charged that he had raped Violet Gay Matherly Reynolds

(Mrs. Reynolds) on that date. Because of his indigency, on 23 July 1973, counsel was appointed to represent him. Defendant was given a preliminary hearing on 27 July 1973 in the district court, which found probable cause and bound him over to the superior court. Soon thereafter defendant escaped from the Caswell County jail and fled to Washington, D. C. His attorney did not see him again until the first of June 1974.

At the 22 October 1973 Session the grand jury returned a true bill of indictment in which he was charged with the common law crime of rape. At his arraignment on 3 June 1974 defendant entered a plea of not guilty. Upon his trial, on 7 June 1974, the jury returned a verdict of "guilty of rape as charged in the bill of indictment." From the mandatory sentence of death imposed under G.S. 14-21 (1966) as interpreted in *State v. Waddell*, 282 N.C. 431, 194 S.E. 2d 19 (1973), defendant appealed to the Supreme Court. His appeal was not perfected by his trial counsel, whose appointment had been continued for that purpose. By order of this Court dated 2 June 1975, trial counsel was removed. On 4 June 1975 defendant's present counsel, Melzer A. Morgan, Jr., Esquire, was appointed to bring up the appeal.

At the trial evidence for the State tended to show:

On 20 July 1973 Mrs. Reynolds, age 56, had been employed at the Hanover Mills in Yanceyville for eight weeks. She had previously lived in Virginia. On that day she was scheduled to work the third shift beginning that night at 11:30 p.m. Her residence was in sight of the mill and a five minutes' walk away. She walked to work that night, following her customary path to the mill. The path took her through the yard of the First Baptist Church, which is separated from the mill property by a driveway. The churchyard was well lighted by street lights, a flood light in the churchyard, lights in front of the mill and on its roof.

As Mrs. Reynolds passed an oak tree beside the path on the west side of the church a man ran up behind her, slapped his hand over her mouth, jerked her arm behind her back, and threw her to the ground. As she fell his hand slipped from her month, and she screamed for help. The man then jerked her up by the arm, slapped his hand over her mouth again, and pushed her back to the oak tree. There he exclaimed, "g . . d. . . . , you are not the one that I was after." He said that he "was after

Diana Fuquay" and asked Mrs. Reynolds if she recognized him. She replied NO. However, she did recognize him as defendant Foddrell, for he was also an employee of the mill—the man who, practically every night, put up the yarn on the machine she operated. When he got her to the oak tree "a car was coming around" the gravel driveway around the church. He pushed her behind the tree until it passed. Then, with her arm behind her back and his hand over her mouth, he dragged her behind some four-foot high shrubbery next to the church. During this time Mrs. Reynolds lost her glasses.

Mrs. Reynolds testified that behind the shrubbery he pushed her down, put one hand on her throat and his knee on her chest. With his other hand he jerked her slacks down to her ankles and said to her, "If you try to yell another time I will cut your g. . d. . . . throat . . . I am going to kill you anyhow." However, at no time did Mrs. Reynolds see a weapon of any kind. With her pants down to her ankles, she "might as well have been tied." He then pried her knees apart and told her if she did not cease her resistance he would kill her "right here and now." Mrs. Reynolds continued to resist to the limit of her ability but defendant forcibly penetrated her. During all this time she was on the ground, flat on her back, and defendant had nothing on but his shoes, underpants, and pants, which he had unfastened and dropped. While he was still assaulting her a car entered the gravel driveway around the church. When defendant saw the car lights he jumped up and ran back of the church, between the church and the mill.

In the automobile were Deputy Sheriffs Carter, Fulcher, and Webster who had come from the sheriff's office five blocks away in response to a telephone call. Hearing Mrs. Reynolds' screams the officers stopped across from the shrubbery. As they jumped from the car they saw defendant Foddrell back out of the shrubbery on his knees, jump to his feet and run. Fulcher observed that this man "was wearing blue dungaree pants and a pair of red underpants." The officers then saw Mrs. Reynolds come up on her side from a prone position and heard her say, "Lord, have mercy; somebody please help me."

Deputy Webster knew defendant. As he and Carter "took out after him," Carter pulled his gun and fired twice in the air. They pursued defendant while Fulcher remained with Mrs. Reynolds. She was "really crying" and upset. She told Fulcher

that she had been raped and she was concerned because her glasses had been knocked off somewhere on the path to the mill. One of the officers later found them in the path.

Officers Carter and Webster, without ever losing sight of defendant, overtook him in the driveway on the east side of the church. He had been running, holding up his pants with his left hand. They were still unbuttoned and his belt "flopped open" when they caught him. He was wearing red shorts and was not wearing a shirt. After capturing defendant, the deputies took him to the police car. Mrs. Reynolds and Fulcher were there and "[s]he said yes, that was him."

On the night of 20 July 1973 Deputy Sheriff Willis was patrolling the area around Hanover Mills and "giving particular attention to the shift change" between 11:15 and 11:30 p.m. He was about 300 feet from the First Baptist Church when he heard two screams coming from that area. When he saw a deputy's car coming around the church he pulled into the circular drive which ran between the church and the mill. He found Mrs. Reynolds standing by Deputy Carter's car. She was "shaking and crying" and trying to get the dirt and grass off her clothing. He observed that her lip was bleeding, one of her eyes was bruised, and there were red marks around her neck. She told him a man had attacked her and raped her and, when Webster and Carter appeared with defendant, she stated in his presence that he was the man. Willis then took Mrs. Reynolds to the sheriff's office and from there to the emergency room at the hospital.

Mrs. Reynolds testified that as a result of defendant's assault upon her she had a black eye; her teeth were knocked through her lips; his fingers made black bruises all over her arm and on her throat; that she had not been with a man in six years and she had blood on her underclothes. In the absence of the jury, Mrs. Reynolds informed the court that two weeks after she was raped she discovered that she had gonorrhea.

After defendant's arrest in the churchyard he was taken to the sheriff's office where a warrant charging him with having raped Mrs. Reynolds was served upon him. He was then fully advised of his rights and asked to sign a waiver. He chose not to sign it, and there was no interrogation. Later in the night defendant was taken to the Roxboro jail in Person

County "to maximum security." Deputy Sheriff Carter testified that the officers did not question him on the way. However, en route, defendant asked him to pick up his shirt for him. He said, "I left my shirt at the oak tree. There is also an empty pack of cigarettes there and also an empty beer can that I left there." Upon their return to Yanceyville the officers went immediately to the oak tree by the church. There they found an empty fresh beer can, an empty pack of cigarettes and a shirt (State's Exhibit 4) where defendant said they were.

Mrs. Reynolds' supervisor at the Hanover Mills and four residents of Pittsylvania County, Virginia, where she had lived before coming to work in Yanceyville, testified that Mrs. Reynolds' general character and reputation were good.

Defendant's testimony tended to show: On 20 July 1973 he was employed at Hanover Mills, working the third shift which began at 11:30 p.m. He had seen Mrs. Reynolds at the mill— never at any other place—, and he had never spoken to her. On 20 July 1973 he was living at a trailer park approximately one-fourth mile from the First Baptist Church, and his usual route to work was the path across the churchyard. Before leaving for work that evening he had been playing and running around the trailer with four friends who also lived at the park. The four friends, William Bigelow, Willie Davis, Gladys Lipcomb, and Helen Neal, testified in corroboration of this statement. Helen Neal said that at 11:25 p.m. Gladys Lipcomb told defendant he had better go to work or he would be late. Defendant testified he left running about 11:20 p.m. after someone had warned him about 11:15 that he would be late. He was carrying his shirt, intending to put it on before he entered the mill.

Upon reaching the church defendant said he took the route around the east side, farthest from the mill, in order to relieve himself. While there he heard a gunshot which was followed by a woman's scream and another shot. Defendant immediately dropped his shirt and started running. First he ran behind the church, then toward the light in front of the church. When he heard somebody say, "Halt" he stopped and the officers handcuffed him.

Defendant testified that the officers never asked him if he "had had anything to do with this lady" either that night or at any time later, and that those who took him to the jail in

Roxboro on the night of 20 July 1973 did not question him at all during the ride from Yanceyville to Roxboro. In his testimony defendant denied raping Mrs. Reynolds. He also denied ever being on the west side of the church where the shrubbery and oak tree were located.

On cross-examination defendant admitted that in Rockingham County he had once been convicted of trespass and twice of disorderly conduct; that in Martinsville, Virginia, he had been convicted of breaking and entering; that he had escaped from the Virginia prison while serving the sentence imposed for the breaking and entering and had come to Yanceyville. Defendant also admitted escaping from the Caswell County jail while being held on this rape charge. He said he escaped and fled to Washington, D. C., because he "did not get bond" and he felt that "if it was a white man that did this or was accused of this that he would have got bond." While in Washington he learned from his girl friend that the FBI was looking for him with "papers for unlawful flight to avoid prosecution," so he "turned himself in." (The record suggests that defendant was returned to North Carolina sometime about the last of May 1974, but the exact date is not shown.)

Other facts pertinent to decision will be referred to in the opinion.

*Attorney General Edmisten; Deputy Attorney General Benoy; and Associate Attorney Allen for the State.*

*Melzer A. Morgan, Jr., for defendant appellant.*

SHARP, Chief Justice.

Seven of defendant's 23 assignments of error relate to the legality and constitutionality of the death sentence. For the reasons stated in *State v. Davis,* 290 N.C. 511, 546-549, 227 S.E. 2d 97, 118-20 (1976), the sentence of death imposed upon defendant must be vacated and one of life imprisonment substituted therefor. In our further consideration of this appeal, therefore, we do not deal with a capital case. We note, however, that the record shows this case to have been tried throughout in strict compliance with our established practice in cases involving the death penalty.

[1] When this case was called for trial defense counsel orally moved for a change of venue. In support of the motion counsel

offered only his uncorroborated "submission" that twelve un-biased jurors could not be found in Caswell County; that there had "been widespread animosity about this"; that at the time of the preliminary hearing on 27 July 1973 "the feeling was high"; that the matter got "widespread notoriety in the news-paper" circulated in the locale; and that defendant's escape was also "given wide circulation." When counsel had completed his remarks the court inquired if he had "anything further" to offer in support of his motion for a change of venue. He said he did not, and the court then heard from the solicitor for the State.

After considering the arguments of both defense counsel and the solicitor for the State, Judge Lupton, in the exercise of his discretion, denied the motion to remove. In the order he recited (1) his opinion "that the defendant can receive a fair and impartial trial in Caswell County"; and (2) his intention to allow defense counsel to interrogate each prospective juror to the extent he deemed appropriate with reference to possible bias and to challenge any who appeared unable to render a fair and impartial verdict.

[2] Defendant then "raised objection to the venire" on the ground that, in his opinion, "the court could find" that a greater preponderance of the jurors were white and "that" would de-prive defendant of "a trial by a cross section of his peers in the county." In answer to the court's inquiry whether the venire had been drawn in the manner required by law, defense counsel conceded that it had been so drawn. Whereupon the court overruled defendant's objection to the venire and inquired if defendant was ready for trial. His attorney answered, "Yes, Sir."

Assignments 11 and 12 challenge respectively the court's denial of the motion for a change of venue and the "motion challenging array." These assignments are overruled. It is ele-mentary that motions for change of venue are addressed to the sound discretion of the trial judge and, absent abuse of discre-tion, his ruling will not be disturbed on appeal. *State v. Brower,* 289 N.C. 644, 224 S.E. 2d 551 (1976). Certainly, no abuse of discretion appears here. It is equally obvious that the remarks of defense counsel with reference to the composition of the jury panel fell far short of establishing a prima facie case of racial discrimination in the selection of the venire.

The record does not disclose the relative number of blacks and whites drawn and summoned as members of the venire. Nor does it show the population ratio of the races in the county or the ratio in which they had previously served on juries. Moreover, "[a]n accused has no right to be indicted or tried by a jury of his own race or even to have a representative of his race on the jury. He does have the constitutional right to be tried by a jury from which members of his own race have not been systematically and arbitrarily excluded." To establish a prima facie case of systematic racial exclusion, "defendants are generally required to produce not only statistical evidence establishing that blacks were underrepresented on the jury but also evidence that the selection procedure itself was not racially neutral, or that for a substantial period in the past relatively few Negroes have served on the juries of the county notwithstanding a substantial Negro population therein, or both. (Lengthy citations omitted.)" *State v. Brower, supra* at 653-54, 224 S.E. 2d at 558-59; *State v. Cornell,* 281 N.C. 20, 187 S.E. 2d 768 (1972) ; *State v. Spencer,* 276 N.C. 535, 173 S.E. 2d 765 (1970).

Defendant having admitted that the jury panel in this case had been drawn as required by the law, and having offered no statistical evidence tending to show systematic exclusion of blacks from jury service, the trial judge was under no obligation *ex mero motu* to conduct an inquiry into these matters. As this Court specifically noted in *State v. Cornell, supra* at 37, 187 S.E. 2d at 778, "The North Carolina statutory plan for the selection and drawing of jurors is constitutional and provides a jury system completely free of discrimination to any cognizable group."

Assignments 6, 7, 8, and 9 relate to the solicitor's *voir dire* examination of prospective jurors with reference to their attitude toward capital punishment.

[3] This case was tried prior to the decision in *Woodson v. North Carolina,* _____ U.S. _____, 49 L.Ed. 2d 944, 96 S.Ct. 2978 (1976). It was, therefore, conducted on the assumption that if the jury found defendant guilty of rape the mandatory death sentence followed as of course. The trial would have been a futile and farcical gesture had the State been required to accept as a member of the traverse jury even one person who was so opposed to capital punishment that he would have refused to return a verdict of guilty even though satisfied beyond a reason-

able doubt that defendant was guilty as charged. Such a person would be no more eligible to serve than one who had previously formed and expressed the opinion that the defendant was guilty of the crime for which he was being tried. It was not error for the solicitor to ask a prospective juror whether he "believed in capital punishment." *State v. Rogers,* 275 N.C. 411, 419, 168 S.E. 2d 345, 349 (1969). Indeed, it was the solicitor's duty to ascertain whether the prospective jurors would find the facts from the evidence adduced in court and apply to these facts the law as given to them by the court.

[4] In this case, however, no juror was excused for cause merely because he did not "believe in capital punishment." The six whom the State successfully challenged because of their attitude toward the death penalty made it quite clear that *under no circumstances* would they return a verdict of guilty of any crime for which the punishment was death. Applicable here is the statement by Justice Huskins in *State v. Britt,* 288 N.C. 699, 706, 220 S.E. 2d 283, 288 (1975) : "With respect to jury selection in capital cases, we have interpreted *Witherspoon v. Illinois,* 391 U.S. 510, 20 L.Ed. 2d 776, 88 S.Ct. 1770 (1968), to mean that veniremen may not be challenged for cause simply because they voice general objections to the death penalty or express conscientious or religious scruples against its infliction; but veniremen who are unwilling to consider all of the penalties provided by law and who are irrevocably committed, before the trial has begun, to vote against the death penalty regardless of the facts and circumstances that might emerge in the course of the trial may be challenged for cause on that ground. (Citations omitted.) In the light of these principles, we hold that the prospective jurors here in question were properly excused for cause."

We note that when the jury was finally passed each juror seated had been accepted by defendant without exhausting his peremptory challenges. Assignments Nos. 6, 7, 8, and 9 are overruled.

Defendant's Assignment No. 16, based on his Exception No. 32, has reference to the solicitor's cross-examination of defendant concerning his failure to deny that he was Mrs. Reynolds' assailant either at the scene of the crime when she identified him as the rapist or a short time thereafter at the sheriff's office when the warrant was served upon him. This

cross-examination must be viewed in the light of the evidence which preceded it. When evaluated in context it cannot be held prejudicial error.

When the State rested its case the evidence tended to show that defendant had raped Mrs. Reynolds on the west side of the church behind some tall shrubbery; that three deputy sheriffs, who had come to the churchyard in response to a telephone call from an unidentified person, saw defendant back out of the shrubbery on his knees, his dungarees down and his red underpants showing; that he fled the scene holding up his pants, his belt flopping; and that the officers, who never lost sight of defendant, captured him in the east driveway just before he got to the highway. On cross-examination defendant explained his dishabille and his presence in the eastern drive (the longer route to the mill) by saying it was the more secluded route and he had the necessity of relieving himself; that after he had stopped "about 15 or 20 feet up in the driveway" he was interrupted in his purpose by the sound of two pistol shots. Not knowing from whence they came and fearing for his safety, he started running toward the light in front of the church. When he turned in response to someone's order to halt, an officer snapped handcuffs on him. Defendant testified, "I was brought back around to where Mrs. Reynolds was, that is when I seen her. That is the first time that I had seen the lady. She pointed me out and accused me of raping her." The cross-examination set out below, which defendant assigns as error, followed the foregoing statement by defendant:

"Q. You did not say anything, did you?

A. Did I say anything?

Q. You didn't say anything did you in response to that?

A. No, I didn't say nothing.

Q. Then later they served a warrant on you and gave you a copy of the warrant, didn't they, charging you with rape?

A. Right.

Q. And you didn't make any statement then did you?

A. No.

Q. And the reason why you didn't make any statement you knew that you had in the past raped Mrs. Reynolds?

Attorney Moore: Objection.

Court: Sustained.

(Exception No. 32)."

**[5]** Citing *United States v. Hale*, 422 U.S. 171, 45 L.Ed. 2d 99, 95 S.Ct. 2133 (1975), defendant contends that it was prejudicial error for the court "to permit the solicitor to cross-examine defendant concerning silence during police interrogation." To this contention there are several answers, each sufficient to overrule Assignment No. 16. One is that defendant neither objected to the questions at the time they were asked nor moved to strike the answers which were made. The final question, to which objection was made and sustained, was not answered. The rule is as quoted in *State v. Jones*, 280 N.C. 322, 339-340, 185 S.E. 2d 858, 869 (1972): "It is elementary that, 'nothing else appearing, the admission of incompetent evidence is not ground for a new trial where there was no objection at the time the evidence was offered.' . . . An assertion in this Court by the appellant that evidence, to the introduction of which he interposed no objection, was obtained in violation of his rights under the Constitution of the United States, or under the Constitution of this State, does not prevent the operation of this rule." *See State v. Lowery*, 286 N.C. 698, 213 S.E. 2d 255 (1975); *State v. Gurley*, 283 N.C. 541, 196 S.E. 2d 725 (1973); 4 Strong's North Carolina Index 3d *Criminal Law* § 162 (1976).

The second answer to defendant's contention is that in this case *there was no police interrogation of defendant at any time.* The situation in which Mrs. Reynolds identified defendant as her attacker was not set up after the event by the police in an effort to entrap defendant into making admissions or statements which could be used against him. When the officers captured defendant running away from the scene of the crime only moments after its commission, it was natural and inevitable that they should walk him back to the spot on the other side of the church where they had left the victim for a confrontation.

**[6]** The moment Mrs. Reynolds saw defendant, and—so far as the record discloses—without any questions having been asked,

she said, "Yes, that's him." Defendant's silence in the face of Mrs. Reynolds' accusation and identification at the scene of the crime was entirely inconsistent with the story he told on the witness stand. When Mrs. Reynolds identified him he had not been given the *Miranda* warning; there had been no time for that. He was lawfully in custody, but he had not been charged with any crime. The evidence was competent to impeach his testimony at the trial and it was offered for no other purpose. *Compare State v. Castor,* 285 N.C. 286, 204 S.E. 2d 848 (1974) where the defendant did not testify and, over his objection, the State offered evidence that after his arrest he had failed to deny incriminating statements made by a codefendant whom the officers interrogated in his presence.

The case of *United States v. Hale,* 422 U.S. 171, 45 L.Ed. 2d 99, 95 S.Ct. 2133 (1975), cited by defendant in support of his position, is distinguishable from this case on its facts. In *Hale,* following his arrest for robbery, the defendant was taken to the police station, given the *Miranda* warning, and then questioned about the source of the money found on his person. The defendant made no response to the questions. Hale testified at his trial. Over his objection, on cross-examination, the prosecutor caused him to admit he had not given the police the exculpatory information to which he had just testified.

In holding that the defendant's motion for a mistrial should have been granted, the Supreme Court said that the Government had failed "to establish a threshold inconsistency between silence at the police station and later exculpatory testimony at trial," and the defendant's silence, while lacking significant probative value, held "significant potential for prejudice." Having just received the *Miranda* warning the defendant "was particularly aware of his right to remain silent." Thus his failure to offer an explanation during the custodial interrogation could "as easily be taken to indicate reliance on the right to remain silent as to support an inference that the explanatory testimony was a later fabrication." The Supreme Court based its decision on the ground that the probative value of the defendant's silence was outweighed by its prejudicial impact and so the Court did not reach the question whether the prosecutor's cross-examination infringed the defendant's constitutional right to remain silent under *Miranda v. Arizona,* 384 U.S. 436, 16 L.Ed. 2d 694, 86 S.Ct. 1602, 10 A.L.R. 3d 975 (1966).

State v. Foddrell

[6]   We hold that the evidence of defendant's silence in the presence of Mrs. Reynolds' accusations at the scene of the crime was properly admitted in evidence for the purpose of impeaching defendant. Had defendant exercised his right not to testify, evidence of his silence at the time of the confrontation and accusation would not have been competent for it would then have been offered as affirmative or substantive evidence tending to establish guilt of the crime charged. *See Harris v. New York,* 401 U.S. 222, 28 L.Ed. 2d 1, 91 S.Ct. 643 (1971) ; *Walder v. United States,* 347 U.S. 62, 98 L.Ed. 503, 74 S.Ct. 354 (1954) ; *State v. Huntley,* 284 N.C. 148, 200 S.E. 2d 21 (1973) ; *State v. Bryant,* 280 N.C. 551, 187 S.E. 2d 111 (1972). However since defendant did take the stand the evidence was admissible to impeach his testimony.

[7]   Defendant's admission on cross-examination that he made no statement at the time the warrant was served on him at the sheriff's office, however, would have been incompetent whether he took the stand or not, had the defendant made timely objection to the question which elicited it. *See State v. McCall,* 286 N.C. 472, 212 S.E. 2d 132 (1975). At the time the warrant was served upon him, Deputy Sheriff Carter had fully advised defendant of his constitutional rights as defined in *Miranda,* and when the officers asked him if he would sign a waiver of rights "he chose not to sign it." Under these circumstances the rationale of *United States v. Hale, supra,* was applicable. However, defendant did not object to this evidence.

Even had defendant objected, this evidence of his silence could not be held to have prejudiced his case in view of his silence at the time he confronted Mrs. Reynolds and all the other circumstances attending his arrest. Lack of prejudice is the final answer to defendant's contention that evidence of his silence at the sheriff's office entitles him to a new trial. When evidence is erroneously admitted, the test of prejudice is "whether, in the setting of this case, we can declare a belief that the erroneously admitted evidence was harmless beyond a reasonable doubt, that is, that there is no reasonable possibility the admission thereof might have contributed to the conviction." *State v. Castor,* 285 N.C. 286, 292, 204 S.E. 2d 848, 853 (1974).

In the evidentiary setting of this case we can *and do* declare the belief that there is no reasonable possibility that

defendant's admissions of silence contributed to his conviction. Defendant was not a stranger to Mrs. Reynolds. He worked where she did, and almost every night he put the yarn on the machine she operated. Her identification of defendant was positive. Here there is no reasonable possibility of a mistaken identification. The officers saw a man wearing blue dungaree trousers and red underpants backing out of the shrubbery to which Mrs. Reynolds' screams had led them. The officers saw this man, who was not wearing a shirt, run away. He was holding up his unbuttoned pants; his unfastened belt was flopping. They gave chase and, without ever losing sight of him, the officers caught him moments later at the edge of the churchyard. The man they caught was the defendant. They immediately returned him to the scene, where Mrs. Reynolds had remained with another officer. As soon as she saw defendant she said, "Yes, it's him." Later that night, defendant asked the officers who took him to jail in Roxboro to retrieve his shirt for him. He said he had left it, along with an empty beer can and an empty pack of cigarettes, behind the oak tree by the path on the west side of the church. This debris is inconsistent with his story that he ran from his home to the church, holding only his shirt and arriving only moments before his arrest. The officers found the shirt and the other two articles where defendant had said they were. Had the officers "caught defendant in the act" the evidence could hardly have been more conclusive of his guilt. Evidence of his silence at the scene or at the sheriff's office added nothing to the State's case, and it indicated nothing but defendant's recognition at the time of the futility of a denial. Assignment No. 16 is overruled.

[8]    Defendant's Assignment No. 19 concerns the failure of the court *ex mero motu* "to conduct a *voir dire* before permitting Deputy Carter to testify to the statements defendant made to him about his shirt."

On direct examination defendant testified, "I had told one of the officers where my shirt was, I don't know which one it was, but when they grabbed me I told one of them to let me get my shirt. . . . I told them to go behind the church and get my shirt." After this testimony Deputy Carter was recalled and testified as follows:

"The defendant asked me to get his shirt. At the time that he asked me to pick up his shirt for him, we were on our way

State v. Foddrell

to Roxboro to carry him to jail to maximum security. We were not trying to question him."

When the solicitor asked Carter how defendant's request "came about," over defendant's objection, he gave the following answer: "We were riding along and Wayne said, 'I left my shirt at the oak tree,' and he said, 'there is also an empty pack of cigarettes there and also an empty beer can that I left there.' . . . and there is where we found it. . . ."

Carter's testimony was interrupted by a further objection from defendant. The court overruled this objection and instructed the jury that the statements which Carter said defendant made to him were received into evidence for the sole purpose of impeaching his testimony, if it did impeach him, and were to be considered for no other purpose.

Assignment No. 19 is overruled for lack of merit. All the evidence tends to show that it was defendant himself who broached the subject of the shirt by requesting the officers to retrieve it for him. He makes no contention that his statements were involuntary or the result of police interrogation. Indeed, he testified without equivocation that on the way to Roxboro, "These officers didn't undertake to question me any." Under these circumstances a *voir dire* could have produced no further evidence. Most important, however, the defendant's statements did not amount to a confession. Thus, the trial judge was not required to conduct a *voir dire* before ruling on the admissibility of the evidence, which was clearly competent for the purpose of impeachment. *State v. Shaw,* 284 N.C. 366, 200 S.E. 2d 585 (1973).

[9] Assignment No. 22, the court's failure to submit to the jury the issues of defendant's guilt of assault with intent to commit rape and assault on a female, is also devoid of any merit. Why this assignment was made or brought forward, we do not understand. In his brief defendant concedes that "submission of such issues to the jury in this case would have been error in favor of the defendant." Mrs. Reynolds testified positively that after defendant had choked her and threatened to kill her, he penetrated her forcibly and against her will. Defendant denied that he was the man who assaulted Mrs. Reynolds. His alibi was that he was on the east side of the church at the time Mrs. Reynolds was assaulted on the west side.

The trial court is required to charge the jury upon the issue of a defendant's guilt of lesser degrees of the crime charged in the indictment only when there is some evidence to sustain a verdict of defendant's guilt of such lesser degrees. There was no such evidence here. *State v. Lampkins,* 286 N.C. 497, 212 S.E. 2d 106 (1975); *State v. Noell,* 284 N.C. 670, 202 S.E. 2d 750 (1974); *State v. Bryant,* 280 N.C. 551, 187 S.E. 2d 111 (1972).

After carefully considering each of defendant's remaining assignments of error we find them to be wholly without merit. The record reveals no error in defendant's *conviction* of the crime with which he was charged. As noted in the beginning, however, the sentence of death cannot be upheld. Accordingly, it is hereby vacated, and this case is remanded to the Superior Court of Caswell County with the following directions: (1) The presiding judge, without requiring the presence of defendant, shall enter a judgment imposing life imprisonment for the rape of which he has been convicted; and (2) in accordance with these judgments the clerk of the superior court shall issue commitments in substitution for the commitments heretofore issued. It is further ordered that the clerk furnish to defendant and his attorney a copy of the judgment and commitment as revised in accordance with this opinion.

No error in the verdict.

Death sentence vacated; life sentence substituted.