STATE OF NORTH CAROLINA v. JANET BELL HALL

No. COA07-9

(Filed 4 December 2007)

**1. Evidence— expert opinion—likelihood of defendant's release following insanity verdict**

The opinion of a mental health expert that defendant would not be released from involuntary commitment for decades if she was found not guilty by reason of insanity was properly excluded from a first-degree murder trial. Defendant presented no evidence tending to show that the testimony would help the jury understand the evidence or determine a fact in issue.

**2. Criminal Law— procedures following insanity verdict— failure to give requested instructions**

The trial court did not err in a first-degree murder prosecution by not giving defendant's modified instructions on post-conviction procedures if defendant was found not guilty by reason of insanity. The instruction given by the court sufficiently informed the jury of the commitment hearing procedures, properly instructed the jury on the central meaning of the statute, and substantially complied with defendant's request. N.C.G.S. § 15A-1321.

**3. Criminal Law— cumulative errors—no reasonable possibility of different outcome**

The cumulative effect of alleged errors in a first-degree murder prosecution did not deprive defendant of a fair trial. The evidence on the record is sufficient to support the jury's verdicts, and there is no reasonable possibility that the jury would have reached a different verdict had the trial court admitted the contested testimony and given defendant's requested instruction.

**4. Evidence— out-of-court statements—instructions on jury's use**

There was no plain error in a first-degree murder prosecution from the trial court's instruction that evidence of out-of-court statements by witnesses could only be considered for impeachment or corroboration.

**5. Criminal Law— prosecutor's argument—disposition to murder**

The trial court did not err in a prosecution for first-degree murder and attempted first-degree murder by overruling defend-

ant's objection to the prosecutor's closing argument that defendant was a person with a disposition toward murder. Assuming that the statement was improper despite evidence that defendant had twice threatened to kill the victims, the jury found defendant guilty based on felony murder rather than premeditated murder, and the evidence supported the jury's verdicts.

**6. Criminal Law— discovery—basis of charge**

The trial court did not err in a first-degree murder prosecution by denying defendant's motion for reciprocal disclosure of the State's theory of the case and by instructing on a theory of felony murder for which defendant had no notice. The short-form murder indictment is sufficient to charge first-degree murder on the basis of any theory set forth in N.C.G.S. § 14-17, including felony murder, and the State is not required to choose its theory of prosecution prior to trial. Defendant may file a motion for a bill of particulars for further disclosure of the facts that support the charge alleged in the indictment.

**7. Appeal and Error— record on appeal—sealed evidence not included—not reviewed**

An assignment of error to the trial court classifying certain documents as non-discoverable in a first-degree murder prosecution was dismissed where the evidence was sealed by the trial court and not included in the appellate record.

Appeal by defendant from judgments entered 24 May 2005 by Judge Beverly T. Beal in Caldwell County Superior Court. Heard in the Court of Appeals 18 October 2007.

*Attorney General Roy Cooper, by Assistant Attorney General Amy C. Kunstling, for the State.*

*Appellate Defender Staples Hughes, by Assistant Appellate Defender Daniel Shatz, for defendant-appellant.*

TYSON, Judge.

Janet Hall ("defendant") appeals from judgments entered after a jury found her to be guilty of first-degree murder and attempted first-degree murder. We find no error.

## I. Background

### A. State's Evidence

Defendant lived in Granite Falls with her husband, James Hall ("Mr. Hall"), their sixteen-year-old daughter, Ashley ("Ashley"), and their eleven-year-old son, Eric ("Eric"). On 26 February 2004, the children's school was canceled due to snow. At approximately 10:00 a.m., Ashley awoke after defendant started to beat her on the head with a baseball bat. Defendant then shot Ashley twice: once in the collar bone and once in the chest. Eric came running down the hall towards Ashley's room. Defendant turned around and shot him in the abdomen and in the back of the neck.

Ashley struggled with defendant for control of the baseball bat and attempted to run away. Ashley ran into the living room where defendant followed her and continued to hit her with the baseball bat. Defendant shot at Ashley a third time, but missed. Defendant kept asking Ashley "why [she] wouldn't die, why [she] couldn't go in peace like her brother did."

Defendant entered the master bedroom and Ashley crawled down the hall into the bathroom. Ashley got into the bathtub and filled it with hot water to stay warm. Ashley remained in the bathtub for several hours until her father arrived home from work at approximately 3:15 p.m..

Mr. Hall entered the residence, walked through the living room, and into the master bedroom. He discovered Eric lying on the floor dead. Defendant was lying on the bed under the covers, with two plastic bags over her head. Mr. Hall asked defendant what had happened. Defendant did not respond. Mr. Hall ripped the bags off of defendant's head and repeatedly asked her what happened and where the telephone was located. Defendant eventually told Mr. Hall where she had hidden the telephone, but asked him not to call 911 because she did not want to go to jail. When Mr. Hall called 911, defendant left the house, entered her vehicle, and drove away. After Mr. Hall called 911, he found Ashley "laying, bleeding, and dying" in the bathtub. Mr. Hall picked Ashley up, brought her to the living room, laid her on the couch and covered her with a blanket.

Law enforcement officers arrived at the Hall residence shortly thereafter. Officers observed blood present in the kitchen, on the living room carpet, and on the floor and walls of the hallway. In the master bedroom, officers found a silver Phoenix Arms .25 caliber semi-

automatic pistol on a dresser. The safety on the pistol was turned off and two live rounds were present in the pistol's magazine. Officers recovered three fired projectiles from inside the Hall residence. Additionally, two fired projectiles were recovered from Ashley's body and one from Eric's body. Testimony tended to show that a total of six projectiles were fired at the crime scene.

Caldwell County Sherrif's Lieutenant Michael Longo ("Officer Longo") arrived and found Ashley lying on the couch. Ashley was pale, shaken, and very frightened. Ashley told Officer Longo defendant had "flipped out" and "went crazy" and had committed these crimes. Ashley described the attack to Officer Longo but could not remember all of the details. Mr. Hall told officers at the scene he believed defendant had committed these crimes and described what he observed after he arrived home from work and entered the residence.

A half-mile down the road, defendant's vehicle rear-ended Barry and Monica Shook's vehicle. Defendant fled the scene of the collision. State Trooper Kevin Milligan ("Trooper Milligan") responded to the call reporting the hit-and-run accident. Trooper Milligan received a description of defendant's car and its license plate number. At approximately 8:30 p.m., Trooper Milligan spotted defendant's vehicle and followed her. Trooper Milligan requested back-up and attempted to stop defendant's vehicle.

A high speed chase ensued. Trooper Milligan and other officers pursued defendant at speeds exceeding 110 miles an hour. The chase ended when defendant crashed head-on into oncoming traffic. Trooper Milligan testified defendant appeared to be "extremely impaired" and was "unaware of what was going on around her."

Defendant was transported to Catawba Memorial Hospital. Defendant was subsequently arrested and transported to the Caldwell County Sheriff's Office. Defendant was charged with and tried capitally for the murder of Eric and for the attempted murder of Ashley.

At trial, Ashley testified defendant had threatened to kill her on two prior occasions. Approximately a year and a half prior to 26 February 2004, defendant told Ashley to follow her outside into the yard. Defendant fired her gun in the air and told Ashley if "she didn't act better" defendant was going to shoot her. A second incident occurred approximately one year prior to 26 February 2004. While Ashley was standing in the kitchen after dinner, defendant came up behind her, put a knife to her throat, and told Ashley if she did not act

better "[defendant] wouldn't think twice about doing it." Ashley testified she was scared after both threats. Defendant had hurt her before and Ashley believed defendant would probably do it again.

SBI Special Agent Shane Green ("Agent Green") testified that based on the number of fired projectiles found at the crime scene and the number of live rounds remaining in the pistol's magazine, defendant had to reload her pistol while committing these crimes. Agent Green also testified that reloading the pistol's magazine could take up to twenty-five seconds.

### B. Defendant's Evidence

Defendant's evidence tended to show the relationship between defendant and Eric was loving, while her relationship with Ashley was more complex. Defendant disapproved of Ashley's friends and became highly upset when she discovered Ashley had intentionally cut herself. Defendant sought therapy for Ashley, who refused to attend. Ashley acknowledged that she had previously lied to DSS, falsely alleging her father had abused her so she could leave the house. Ashley believed her parents were overly restrictive. Mr. Hall had broken up physical fights between defendant and Ashley on more than one occasion. Despite these conflicts, defendant was described as "an excellent mother who loved her daughter" by family acquaintances.

Defendant produced evidence of a long history of depression. Defendant first sought treatment in 1996, after her father's death. In 1998, Dr. Guttler, defendant's family physician, prescribed Zoloft to treat defendant's depression. Dr. Guttler prescribed a different medication when Zoloft reportedly made defendant "jittery." Defendant continued to suffer from depression and experienced suicidal thoughts. In November 1998, defendant was admitted to the psychiatric unit at Frye Memorial Hospital to be evaluated by a psychiatrist. Defendant stayed in the hospital for a day and a half. Defendant was treated in the hospital and post-release by Dr. Kim. Upon Dr. Kim's retirement, defendant's care was turned over to Dr. Synn.

In November 2003, defendant experienced complications with her medication, including tremors, anxiety, insomnia, and depression. During this time, Dr. Synn significantly changed defendant's medication. In February 2004, defendant complained she was again depressed. During the month of February 2004, Dr. Synn adjusted and changed defendant's medication a total of four times, the last time being on 25 February 2004, the day before the crimes were committed.

Defendant retained two mental health experts, Dr. James Bellard ("Dr. Bellard") and Dr. John Warren ("Dr. Warren"), to examine her and to testify to their opinion of her mental state at the time the crimes were committed. Dr. Bellard qualified as an expert in forensic psychiatry and testified defendant suffered from depression with psychotic features and from substance induced mood disorder on 26 February 2004. Dr. Bellard testified defendant developed a delusion that she had to die and her children could not live without her. Dr. Bellard opined defendant did not know the nature and quality of her actions, could not tell right from wrong, and was unable to form the specific intent to kill.

Dr. Warren, a clinical psychologist, examined defendant in jail on 2 March 2004. Dr. Warren testified that on 26 February 2006, defendant suffered from major depression with psychotic features and from substance induced mood disorder. Dr. Warren also opined that defendant did not know the nature and quality of her acts and could not appreciate the wrongfulness of her conduct. Dr. Warren opined defendant was unable to form a specific intent to kill due to her delusional beliefs. Dr. Warren stated the "medication effects on this woman worsened and were [the] proximate cause of the episode that she had on February 26th 2004."

Dr. Nicole Wolfe ("Dr. Wolfe"), a forensic psychiatrist at Dorothea Dix Hospital, examined defendant at the request of the State. Dr. Wolfe agreed with Dr. Bellard's and Dr. Warren's diagnoses. Dr. Wolfe opined that defendant was so severely depressed and her mind was so clouded by medication, that she could not appreciate the difference between right and wrong and was unable to form the specific intent to kill.

Dr. Richard Kapit ("Dr. Kapit") testified as a non-examining expert in psychiatry and adverse drug reactions. Dr. Kapit testified that Zoloft, a medication defendant had taken, could "flip a person into a . . . manic state[] where they can become psychotic, [experience] false beliefs, and be very rash, impulsive and dangerous. . . . There is an increased risk of mania causing suicide and homicide." Dr. Kapit conceded that reports of homicidal reactions from the drug "were extremely rare."

On 18 April 2005, defendant was tried capitally in Caldwell County Superior Court. On 19 May 2005, the jury found defendant to be guilty of the attempted murder of Ashley and guilty of first-degree murder of Eric under the felony murder rule. On 24 May 2005,

following a capital sentencing hearing, the jury recommended life imprisonment without the possibility of parole. The trial court sentenced defendant to life imprisonment without parole for the conviction of first-degree murder and imposed a consecutive sentence of a minimum of 155 and a maximum of 195 months imprisonment for defendant's conviction of attempted first-degree murder. Defendant appeals.

## II.  Issues

Defendant argues the trial court erred by: (1) excluding Dr. Bellard's testimony regarding the post-conviction consequences of finding defendant not guilty by reason of insanity; (2) overruling defendant's objection to the pattern jury instruction and refusing to give her proposed modified instruction; (3) instructing the jury that evidence of witnesses' out-of-court statements could only be considered for the purpose of impeaching or corroborating trial testimony; (4) overruling defendant's objection to the prosecutor's closing argument describing her as having "a disposition towards murder"; (5) denying her motion for reciprocal disclosure of the State's theory of the case; and (6) refusing to provide discoverable items following the court's *in camera* review.

## III.  Excluding Expert Testimony

[1] Defendant argues the trial court erred by using Rule 403 to exclude Dr. Bellard's offered testimony regarding the post-conviction consequences of the jury finding defendant not guilty by reason of insanity. We disagree.

## A.  Standard of Review

"Whether to exclude expert testimony under Rule 403 is within the sound discretion of the trial court and will only be reversed on appeal for abuse of discretion." *Howerton v. Arai Helmet, Ltd.*, 358 N.C. 440, 463, 597 S.E.2d 674, 689 (2004). "An abuse of discretion occurs when a trial judge's ruling is manifestly unsupported by reason." *State v. Summers*, 177 N.C. App. 691, 697, 629 S.E.2d 902, 907 (internal citations and quotations omitted), *disc. rev. denied*, 360 N.C. 653, 637 S.E.2d 192 (2006).

## B.  Analysis

Expert testimony is admissible "[i]f scientific, technical or other specialized knowledge *will assist the trier of fact to understand the evidence or to determine a fact in issue*, a witness qualified as an

expert . . . may testify thereto in the form of an opinion." N.C. Gen. Stat. § 8C-1, Rule 702(a) (2005) (emphasis supplied). In determining the admissibility of expert testimony, "[t]he trial court must always be satisfied that the [] testimony is relevant." *Howerton*, 358 N.C. at 462, 597 S.E.2d at 688. The trial court "has inherent authority to limit the admissibility . . . [of] expert testimony, under North Carolina Rule of Evidence 403 . . . ." *Id.* at 462, 597 S.E.2d at 689.

N.C. Gen. Stat. § 8C-1, Rule 403 (2005) provides, "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, *confusion of the issues, or misleading the jury*, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." (Emphasis supplied). This Court has stated, "[We] will not intervene where the trial court has properly weighed both the probative and prejudicial value of evidence before it." *Tomika Invs., Inc. v. Macedonia True Vine Pent. Holiness Ch. of God*, 136 N.C. App. 493, 498, 524 S.E.2d 591, 595 (2000).

Defense counsel sought to have Dr. Bellard offer his opinion to the jury of the likelihood of defendant's release from involuntary commitment at Dorothea Dix Hospital if she were to be found not guilty by reason of insanity. During *voir dire*, Dr. Bellard opined defendant would not be released from involuntary commitment "for decades." The trial court found:

> such information is [ir]relevant to this case in that it will not help the jury understand the evidence or determine a fact in issue. . . . Assuming arguendo that it has some probative value the Court would apply [the N.C. Gen. Stat. § 8C-1, Rule] 403 valuation and find that the probative value is far outweighed by the confusion of the issues.

The trial court cited *State v. Mancuso* as the basis of its ruling. 321 N.C. 464, 364 S.E.2d 359 (1988).

In *Mancuso*, defense counsel sought to offer testimony from an Assistant Attorney General on the State's procedures for treating people involuntarily committed to the State's mental health facilities. 321 N.C. at 468, 364 S.E.2d at 362. The State objected and the trial court sustained the objection based on the "subject matter about which [the expert] planned to testify." *Id.* at 468-69, 364 S.E.2d at 362. Our Supreme Court upheld the trial court's ruling stating, "defendant . . . made no showing that [the expert] testimony on involuntary commit-

ment procedures would help the jury understand the evidence, or determine a fact in issue." *Id.* at 469, 364 S.E.2d at 363.

Here, the trial court "properly weighed both the probative and prejudicial value of evidence before it." *Tomika Invs., Inc.*, 136 N.C. App. at 498, 524 S.E.2d at 595. The trial court found Dr. Bellard's testimony could confuse the issues of the case with the possible consequences and his testimony would not assist the jury in regard to any matter in issue or fact. Defendant has presented no evidence tending to show Dr. Bellard's testimony "would help the jury understand evidence, or determine a fact in issue." *Mancuso*, 321 N.C. 469, 364 S.E.2d 363. The trial court properly excluded Dr. Bellard's testimony under Rules 403 and 702(a) of the North Carolina Rules of Evidence. Defendant has failed to show an abuse of discretion in the trial court's ruling. This assignment of error is overruled.

### IV. Involuntary Commitment Procedure Instructions

**[2]** Defendant argues the trial court erred by overruling her objection to the pattern jury instructions and refusing to give her proposed modified instruction of the post-conviction commitment procedures following a verdict of not guilty by reason of insanity. We disagree.

### A. Standard of Review

We review jury instructions:

> contextually and in its entirety. The charge will be held to be sufficient if it presents the law of the case in such manner as to leave no reasonable cause to believe the jury was misled or misinformed . . . . The party asserting error bears the burden of showing that the jury was misled or that the verdict was affected by [the] instruction. Under such a standard of review, it is not enough for the appealing party to show that error occurred in the jury instructions; rather, *it must be demonstrated that such error was likely, in light of the entire charge, to mislead the jury.*

*State v. Blizzard*, 169 N.C. App. 285, 296-97, 610 S.E.2d 245, 253 (2005) (emphasis supplied) (internal citations and quotations omitted).

### B. Analysis

"[U]pon request, a defendant who interposes a defense of insanity to a criminal charge is entitled to an instruction by the trial judge setting out *in substance* the commitment procedures outlined in G.S. 122-84.1, [repealed and replaced by N.C. Gen. Stat. § 122C], applica-

ble to acquittal by reason of mental illness." *State v. Hammonds*, 290 N.C. 1, 15, 224 S.E.2d 595, 604 (1976) (emphasis supplied). "[F]ailure to give such instructions [is] prejudicial because the jury might tend to return a verdict of guilty so as to ensure that the accused would be incarcerated for the safety of the public and for his own safety." *State v. Bundridge*, 294 N.C. 45, 53, 239 S.E.2d 811, 817 (1978) (citing *Hammonds*, 290 N.C. 1, 224 S.E.2d 595 (1978)). Our Supreme Court in *Hammonds* did not set forth the precise jury instructions to be given for post-conviction involuntary commitment procedures under the statute. *State v. Harris*, 306 N.C. 724, 727, 295 S.E.2d 391, 393 (1982). The appellate court must undertake "a case by case determination" of whether the trial court substantially complied with this rule. *Id.*

Our Supreme Court has held when a trial court instructs the jury on:

the central meaning of the statute: that if defendant was acquitted by reason of insanity, he would not be released but would be held in custody until a hearing could be held to determine whether he should be confined to a state hospital. . . . [is] sufficient to remove any hesitancy of the jury in returning a verdict of not guilty by reason of insanity, engendered by a fear that by so doing they would be releasing the defendant at large in the community.

*Id.*

Here, defendant requested a modified jury instruction regarding post-verdict commitment procedures after a verdict of not guilty by reason of insanity. The trial court instructed on involuntary commitment procedures as follows:

A defendant found not guilty by reason of insanity shall immediately be committed to a state mental facility. After the defendant has been automatically committed, the defendant shall be provided a hearing in [sic] within fifty days. At this hearing the defendant shall have the burden of proving by preponderance of the evidence that the defendant no longer has a mental illness, or is no longer dangerous to others. If the Court is so satisfied it shall order the defendant discharged and released. If the Court finds that the defendant has not met the burden of proof upon the defendant, then it shall order that in patient commitment continue *for a period not to exceed ninety days. This involuntary commitment will continue* subject to periodic review until the Court finds that the defendant no longer has a mental illness or is no longer dangerous to others.

(Emphasis supplied). Defendant's proposed modified instruction deleted the language italicized above from the pattern jury instruction. Defendant argues the pattern jury instruction was ambiguous and misled the jury to believe if defendant was found not guilty by reason of insanity, she would be released no more than ninety days after the initial hearing. We disagree.

"A trial court is not required to give requested instructions verbatim." *State v. Allen,* 322 N.C. 176, 197, 367 S.E.2d 626, 637 (1988) (citation omitted). The trial court gave the pattern jury instruction regarding involuntary commitment procedures pursuant to N.C.P.I.—Crim. 304.10. These instructions sufficiently informed the jury of the commitment hearing procedures in N.C. Gen. Stat. § § 15A-1321 and N.C. Gen. Stat. § 122C. *Id.* at 198-99, 367 S.E.2d at 638. We find the trial court properly instructed the jury on "the central meaning of the statute" and its instruction substantially complied with defendant's request. *Harris,* 306 N.C. at 727, 295 S.E.2d at 393. This assignment of error is overruled.

### C.  Cumulative Effect of Alleged Errors

**[3]** Defendant asserted during oral argument that the cumulative effect of the preceding alleged errors deprived defendant of a fair trial. We disagree.

"[A] defendant has the burden of demonstrating not only error, but also that the error[s] complained of [were] prejudicial, i.e., that there is a reasonable possibility that a different verdict would have been reached had the errors not been committed." *State v. Temples,* 74 N.C. App. 106, 109-10, 327 S.E.2d 266, 268 (citations omitted), *disc. rev. denied,* 314 N.C. 121, 332 S.E.2d 489 (1985). The State presented evidence that defendant: (1) had threatened to kill Ashley on two prior occasions more than a year prior to these crimes; (2) contemplated death before the crimes occurred; (3) had to reload her gun while shooting both Ashley and Eric; (4) while attempting to murder Ashley, stated "why [will you not] die . . . and go in peace like [your] brother did"; (5) hid the telephone so Ashley and Mr. Hall were unable to call 911; (6) asked Mr. Hall not to call 911 because "she did not want to go to jail"; (7) fled the crime scene after Mr. Hall called 911; (8) rear-ended another vehicle and fled the scene of the accident; and (9) engaged in a high speed chase with police, only stopping when she crashed head on into oncoming traffic.

We find the evidence presented on the record is sufficient to support the jury's verdicts. The jury rejected premeditation and delibera-

tion and chose felony murder as the basis to support defendant's first-degree murder conviction. The above evidence supports the jury's: (1) rejection of defendant's evidence and defense of insanity and (2) finding that defendant knew right from wrong and understood the nature and quality of her actions when she committed the crimes. We hold there is no reasonable possibility the jury would have reached a different verdict had the trial court admitted Dr. Bellard's testimony and given defendant's modified jury instruction on post-conviction involuntary commitment procedures.

## V.  Prior Statements Instruction

**[4]** Defendant argues the trial court's instruction that evidence of out-of-court statements by witnesses could only be considered for impeachment or corroboration constitutes plain error. We disagree.

### A.  Standard of Review

[T]he plain error rule . . . is always to be applied cautiously and only in the exceptional case where, after reviewing the entire record, it can be said the claimed error is a "*fundamental error, something so basic, so prejudicial, so lacking in its elements that justice cannot have been done*," or "where [the error] is grave error which amounts to a denial of a fundamental right of the accused," or the error has "resulted in a miscarriage of justice or in the denial to appellant of a fair trial" or where the error is such as to "seriously affect the fairness, integrity or public reputation of judicial proceedings" or where it can be fairly said "the instructional mistake had a probable impact on the jury's finding that the defendant was guilty."

*State v. Odom*, 307 N.C. 655, 660, 300 S.E.2d 375, 378 (1983) (quoting *United States v. McCaskill*, 676 F.2d 995, 1002 (4th Cir. 1982)) (emphasis original).

### B.  Analysis

Defendant argues Ashley's statements to Officer Longo that defendant had "flipped out" and "went crazy" and Mr. Hall's statement to a 911 operator that defendant's "nerves were shot" were admissible for substantive purposes. We disagree.

Defendant correctly states that both Ashley's and Mr. Hall's out-of-court statements were admitted into evidence without objection. Subsequently, the trial court gave the jury instructions regarding witnesses' prior statements pursuant to N.C.P.I.—Crim. 105.20. The trial court stated:

Members of the jury, when evidence has been received tending to show that at an earlier time a witness made a statement, either spoken or in writing, *which may be consistent or may conflict with that witness [sic] testimony,* you should not consider such earlier statement as evidence of the truth of what was said at that earlier time, because it was not made under oath at this trial. If you believe that such earlier statement was made, and that it is consistent, or that it does conflict with the testimony of the witness at this trial, then you may consider this together with all other facts and circumstances bearing upon the witness [sic] truthfulness in deciding whether you believe or disbelieve the witness testimony at this trial.

(Emphasis supplied). Defendant concedes that she neither objected to this instruction nor requested additional instructions.

N.C.P.I.—Crim. 105.20 is a correct statement of the law regarding prior inconsistent statements. Prior inconsistent statements are not admissible as substantive evidence. *State v. Williams,* 355 N.C. 501, 533, 565 S.E.2d 609, 628 (2002) (citations omitted), *cert. denied,* 537 U.S. 1125, 154 L. Ed. 2d 808 (2003).

On cross-examination, Ashley denied telling Officer Longo defendant had "flipped out" and "went crazy" when he arrived at the crime scene. Subsequently, defense counsel asked Officer Longo how Ashley responded when he asked her what occurred that morning. Officer Longo testified, "I had asked Ashley what happened and she stated, 'My mom just flipped out; she went crazy.' " Defense counsel properly impeached Ashley's trial testimony with proof of a prior inconsistent statement. *State v. Whitley,* 311 N.C. 656, 663, 319 S.E.2d 584, 589 (1984). Defendant's argument that Ashley's statement was admissible as substantive evidence is without merit. The trial court properly instructed the jury that prior inconsistent statements could only be used for impeachment purposes.

Further, at trial, Mr. Hall did not testify to what he stated to the operator when he called 911. Therefore, Mr. Hall's statement that defendant's "nerves were shot" was neither a prior consistent nor inconsistent statement. The jury instruction was therefore not applicable to Mr. Hall's statement.

Presuming *arguendo,* Ashley's and Mr. Hall's statements could be admissible as substantive evidence under some theory, defendant has failed to show that the trial court's pattern jury instruction consti-

tutes "plain error." *Odom*, 307 N.C. at 660, 300 S.E.2d at 378. Defendant presented extensive opinion testimony from four mental health expert witnesses concerning her mental state at the time of the crime. Additionally, the jury heard the following evidence: (1) Mr. Hall's and Ashley's testimony regarding defendant's behavior leading up to 26 February 2004; (2) defendant's comment to Ashley about dying together; (3) Ashley's testimony regarding defendant's behavior at the time of the crime; (4) Mr. Hall's testimony describing defendant's behavior after the crime had occurred; and (5) Trooper Milligan's testimony that defendant was "extremely impaired" and "unaware of what was going on around her."

The State presented overwhelming evidence to support the jury's guilty verdict. Under plain error review, defendant has failed to show the alleged "instructional mistake had a probable impact on the jury's finding that the defendant was guilty." *Odom*, 307 N.C. at 660, 300 S.E.2d at 378. This assignment of error is overruled.

### VI. Prosecutor's Closing Argument

**[5]** Defendant argues the trial court erred by overruling defendant's objection to the portion of the prosecutor's closing argument describing defendant as a person with "a disposition towards murder." We disagree.

### A. Standard of Review

The standard of review for improper closing arguments that provoke timely objection from opposing counsel is whether the trial court abused its discretion by failing to sustain the objection. In order to assess whether a trial court has abused its discretion when deciding a particular matter, this Court must determine if the ruling could not have been the result of a reasoned decision.

*State v. Jones*, 355 N.C. 117, 131, 558 S.E.2d 97, 106 (2002) (internal citations and quotations omitted).

### B. Analysis

During closing arguments, "an attorney may . . . on the basis of his analysis of the evidence, argue any position or conclusion with respect to a matter in issue." N.C. Gen. Stat. § 15A-1230 (2005). "Counsel are given wide latitude in arguments to the jury and are permitted to argue the evidence that has been presented and all reasonable inferences that can be drawn from that evidence." *State v.*

*Richardson,* 342 N.C. 772, 792-93, 467 S.E.2d 685, 697, *cert. denied,* 519 U.S. 890, 136 L. Ed. 2d 160 (1996).

A prosecutor's closing remarks "are to be viewed in the context in which they are made and in light of the overall factual circumstances to which they refer." *State v. Davis,* 349 N.C. 1, 44, 506 S.E.2d 455, 479 (1998), *cert. denied,* 526 U.S. 1161, 144 L. Ed. 2d 219 (1999). To justify a new trial, an inappropriate prosecutorial comment must be sufficiently grave to constitute prejudicial error. *State v. Britt,* 291 N.C. 528, 537, 231 S.E.2d 644, 651 (1977). "[T]o reach the level of prejudicial error in this regard . . . the prosecutor's comments must have so infected the trial with unfairness as to make the resulting conviction a denial of due process." *State v. Worthy,* 341 N.C. 707, 709-10, 462 S.E.2d 482, 483 (1995) (citation omitted).

During the prosecutor's closing argument, he stated "if one has a disposition toward murder . . . ." We review the prosecutor's closing argument as a whole and must determine in what context the statement was being made. Prior to the challenged statement, the prosecutor argued defendant: (1) had a motive for killing her family; (2) contemplated death; and (3) was not having delusions, but was thinking of killing her family. Viewed in the context of these arguments, it appears by making the challenged statement, the prosecutor was arguing defendant should be found guilty of first-degree murder based on defendant's premeditated and deliberate murder of Eric and attempted murder of Ashley.

"The trial court has a duty, upon objection, to censor remarks not warranted by either the evidence or the law, or remarks calculated to mislead or prejudice the jury." *State v. Britt,* 288 N.C. 699, 712, 220 S.E.2d 283, 291 (1975). The trial court overruled defendant's objection to the challenged statement and concluded, "the argument of counsel is supported by some evidence." The trial court based this ruling on evidence presented tending to show defendant had threatened to kill Ashley on two occasions prior to 26 February 2004. The prosecutor properly argued "the evidence that [was] [] presented and all reasonable inferences that c[ould] be drawn from that evidence." *Richardson,* 342 N.C. at 792-93, 467 S.E.2d at 697. Defendant has failed to show the trial court abused its discretion by overruling defendant's objection to a portion of the prosecutor's statement.

Presuming *arguendo* the statement was improper, the prosecutor's statement did not "so infect[] the trial with unfairness as to make the resulting conviction a denial of due process." *Worthy,*

341 N.C. at 709-10, 462 S.E.2d at 483 (1995). The jury found defendant guilty of first-degree murder under the theory of felony murder, not on the basis of premeditation and deliberation. The State presented overwhelming evidence that defendant had shot and killed Eric while she was attempting to murder Ashley. This evidence supports the jury's verdicts on both convictions. This assignment of error is overruled.

## VII.  Reciprocal Disclosure

[6] Defendant argues the trial court erred by denying defendant's motion for reciprocal disclosure of the State's theory of the case and by instructing the jury on a theory of felony murder for which the defense had no notice. We disagree.

Defendant filed a pre-trial motion for reciprocal disclosure concerning the theory upon which the State sought a conviction of first-degree murder, including. the disclosure of the felonies which supported felony murder. The trial court denied defendant's motion. Defendant argues the denial of this motion violates defendant's constitutional rights to due process and prior notice of the charges against her. Based on existing North Carolina law, defendant's argument is without merit.

Our Supreme Court has repeatedly held a short-form murder indictment is sufficient to charge first-degree murder on the basis of *any theory* set forth in N.C. Gen. Stat. § 14-17, including felony murder. *State v. Garcia*, 358 N.C. 382, 388, 597 S.E.2d 724, 731-32 (2004), *cert. denied*, 543 U.S. 1156, 161 L. Ed. 2d 122 (2005); *State v. Braxton*, 352 N.C. 158, 174, 531 S.E.2d 428, 437 (2000), *cert. denied*, 531 U.S. 1130, 148 L. Ed. 2d 797 (2001); *State v. King*, 311 N.C. 603, 608, 320 S.E.2d 1, 5 (1984).

"The State is not required at any time to elect a theory upon which it will proceed against the defendant on the charge of first degree murder." *State v. Clark*, 325 N.C. 677, 684, 386 S.E.2d 191, 195 (1989). Further, "[b]y requesting . . . the State [to] identify which predicate felony it intended to prove at trial, defendant essentially sought disclosure of the State's legal theory. . . . The State is not required to choose its theory of prosecution prior to trial." *Garcia*, 358 N.C. at 389-90, 597 S.E.2d at 732.

If defendant seeks further disclosure of the facts that support the charge alleged in the indictment, defendant may file a motion for a

bill of particulars. N.C. Gen. Stat. § 15A-925(b) (2005); *State v. Randolph*, 312 N.C. 198, 210, 321 S.E.2d 864, 872 (1984). This assignment of error is overruled.

## VIII. Discovery

**[7]** Defendant argues the trial court erred by refusing to provide discoverable items following its *in camera* review. We dismiss this assignment of error.

### A. Standard of Review

"A trial court's order regarding matters of discovery are generally reviewed under an abuse of discretion standard." *Morin v. Sharp*, 144 N.C. App. 369, 374, 549 S.E.2d 871, 874 (citation omitted), *disc. rev. denied*, 354 N.C. 219, 557 S.E.2d 531 (2001). "An abuse of discretion occurs when a trial judge's ruling is manifestly unsupported by reason." *Summers*, 177 N.C. App. at 697, 629 S.E.2d at 907.

### B. Analysis

At trial, defendant requested a copy of the prosecutor's file under N.C. Gen. Stat. § 15A-903(a)(1). The State compiled a work product inventory of materials it argued were protected from disclosure as attorney work product pursuant to N.C. Gen. Stat. § 15A-904. After *in camera* review, the trial court ruled that some materials defendant had requested were non-discoverable and would be placed under seal for appellate review. These materials are not included as part of the record on appeal.

"It is the duty of the appellant to see that the record is properly [prepared] and transmitted." *Hill v. Hill*, 13 N.C. App. 641, 642, 186 S.E.2d 665, 666 (1972). The appellant also has the duty to ensure that the record is complete and contains the materials asserted to contain error. *Pharr v. Worley*, 125 N.C. App. 136, 139, 479 S.E.2d 32, 34 (1997). Rule 9 of the North Carolina Rules of Appellate Procedure requires that "exhibit[s] offered in evidence and *required for understanding of errors assigned* shall be filed in the appellate court." N.C.R. App. P. 9(d)(2) (2008) (emphasis supplied).

Here, the record on appeal does not contain the non-discoverable materials the trial court placed under seal. This omission prevents this Court from determining whether the trial court erred in classifying certain State documents as non-discoverable pursuant to N.C. Gen. Stat. § 15A-904. This assignment of error is dismissed.

**STATE v. HALL**

[187 N.C. App. 308 (2007)]

## IX. Conclusion

Defendant failed to show the trial court abused its discretion by "properly weigh[ing] both the probative and prejudicial value of evidence before it" and excluding Dr. Bellard's testimony from the jury, regarding the likelihood of defendant's release from Dorothea Dix Hospital if the jury found her to be not guilty by reason of insanity. *Tomika Invs., Inc.*, 136 N.C. App. at 498, 524 S.E.2d at 595. The trial court's jury instruction explained "the central meaning of the statute" and substantially complied with defendant's request for a jury instruction regarding post-verdict commitment procedures if defendant were to be found not guilty by reason of insanity. *Harris*, 306 N.C. at 727, 295 S.E.2d at 393.

The trial court properly instructed the jury regarding witnesses' prior statements. The trial court properly overruled defendant's objection to a portion of the prosecution's closing argument because the prosecutor's statement was "warranted by the evidence" presented at trial. *Britt*, 288 N.C. at 712, 220 S.E.2d at 291.

Based on existing North Carolina law, the trial court was not required to order the State to disclose to defendant the underlying theory to support the charge of first-degree murder prior to trial. *Garcia*, 358 N.C. at 389-90, 597 S.E.2d at 732. Finally, the record is devoid of sealed documents reviewed by the trial court *in camera*. We cannot determine whether the trial court erred in classifying documents in the State's file as non-discoverable pursuant to N.C. Gen. Stat. § 15A-904.

Defendant received a fair trial, free from the prejudicial errors she preserved, assigned, and argued. Under plain error review, the absence of all or any of the alleged plain errors would not have had a probable impact on the jury's finding that defendant was guilty. We find no error.

No Error.

Judges McCULLOUGH and STROUD concur.